IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2019 Session

**STATE OF TENNESSEE v. CORY LAMONT BATEY**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-C-1517    Monte Watkins, Judge**

_____

**No. M2017-02440-CCA-R3-CD**
_____

A Davidson County Criminal Court Jury convicted the Appellant, Cory Lamont Batey, of one count of aggravated rape, a Class A felony; two counts of attempted aggravated rape, a Class B felony; one count of facilitation of aggravated rape, a Class B felony; and three counts of aggravated sexual battery, a Class B felony. After a sentencing hearing, he received a fifteen-year sentence to be served at one hundred percent for the aggravated rape conviction and concurrent eight-year sentences for the remaining convictions for a total effective sentence of fifteen years. On appeal, the Appellant contends that the trial court improperly instructed the jury on the mens rea for the offenses and erred by instructing the jury that voluntary intoxication was not a defense to aggravated rape; that the trial court erred by failing to dismiss the superseding indictment because it violated double jeopardy; that the trial court improperly admitted hearsay evidence regarding a codefendant's statements and conduct; and that the evidence is insufficient to support the convictions. The State argues that the trial court erred during sentencing by considering ex parte letters and emails written on the Appellant's behalf and requests that this court remand the case to the trial court for a new sentencing hearing. We conclude that the State should not have issued a superseding indictment charging the Appellant with aggravated rape in count four but that plain error does not require a retrial on that count. Accordingly, finding no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Peter J. Strianse (on appeal) and Worrick G. Robinson, IV, Courtney Teasley, and Khadija Babb (at trial), Nashville, Tennessee, for the appellant, Cory Lamont Batey.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Thomas Thurman,

Roger Moore, and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

In August 2013, the Davidson County Grand Jury indicted Brandon E. Banks, Jaborian Dashon McKenzie, Brandon Robert Vandenburg, and the Appellant, all of whom were members of Vanderbilt University's football team, for aggravated rape in counts one through five and aggravated sexual battery in counts six and seven. In addition, the grand jury indicted Vandenburg for tampering with evidence in count eight and unlawful photography in count nine. The State jointly tried the Appellant and Vandenburg in January 2015, and the jury convicted them as charged in counts one through three and counts five through nine. The jury convicted them of attempted aggravated rape as a lesser-included offense of aggravated rape in count four.

In June 2015, the trial court declared a mistrial and vacated the convictions due to juror misconduct. In July 2015, the State filed a superseding indictment, again charging each of the four defendants with aggravated rape in counts one through five and aggravated sexual battery in counts six and seven. The indictment also charged Vandenburg with one count of unlawful photography. The State retried the Appellant separately from his codefendants in April 2016.

All of the counts involved the same victim and allegedly occurred on June 23, 2013. At trial, Julianna Martel testified that in June 2013, she was a student at Vanderbilt University. Martel and the victim were "good friends," and Martel knew Vandenburg "a little bit." On the night of June 22, Martel went to Tin Roof bar. She saw the victim, and the victim seemed "normal." Martel also saw Vandenburg and "didn't notice anything out of ordinary." Martel left Tin Roof about 1:30 a.m. on June 23. Before she left, she "met up" with the victim. The victim was "holding a blue drink in her hand that she had just got" and "seemed great, normal." Martel was not concerned about the victim.

Lieutenant Donnie Harville of the Vanderbilt University Police Department testified that on the morning of Wednesday, June 26, 2013, he received a telephone call, requesting that he investigate an incident involving a broken door at Gillette Hall athletics dormitory. Lieutenant Hall reviewed June 23 video surveillance from the dormitory in order to determine who broke the door and "noticed four males appearing to be carrying an unconscious female." Lieutenant Hall began trying to identify the five individuals and obtained additional June 23 video from numerous surveillance cameras in the dormitory. After viewing the video, he contacted the Sex Crimes Unit of the Metropolitan Nashville Police Department (MNPD) and asked for assistance.

The State played the surveillance video for the jury while Lieutenant Hall narrated a timeline of events. The video showed the victim's black Mercedes pulling up to Gillette Hall at 2:27 a.m. on June 23. Vandenburg, wearing a white t-shirt and blue pants, got out of the driver's seat and walked to the dormitory's entrance. Shortly thereafter, he returned to the car with McKenzie and Banks. Vandenburg opened the passenger door of the Mercedes, and Quela Royster and the Appellant walked to the passenger side of the car. Royster left the scene, and Vandenburg took the unresponsive victim out of the Mercedes. Vandenburg carried the victim into Gillette Hall and into a first-floor elevator. He put her onto the floor, and he and Banks took the elevator to the second floor. Vandenburg dragged the still-unresponsive victim out of the elevator and into the second-floor hallway. He and Banks appeared to use their cellular telephones to photograph the victim.

At 2:36 a.m., Vandenburg, holding the victim's arms, and Banks, holding the victim's ankles, carried her down the hallway. They were joined by McKenzie and the Appellant, both of whom stepped off the elevator and were eating food. Vandenburg carried the victim toward room 213, which he shared with Mack Prioleau, and the three codefendants followed him. At 3:05 a.m., McKenzie came from the area of room 213, followed by a shirtless Banks. Vandenburg, also shirtless and wearing shorts and socks, came from the area of his room, and the three of them went into the bathroom. At 3:10 a.m., Vandenburg, with a towel over his head, walked up to the hallway surveillance camera and put the towel over it. The towel remained on the camera until 3:26 a.m.

At 3:11 a.m., another camera recorded McKenzie and Banks leaving the area of room 213. About thirty seconds later, the fully-clothed Appellant walked away from the area of room 213 and into the second-floor lobby of Gillette Hall. McKenzie and Banks, who were roommates, entered their dormitory room on the sixth floor at 3:12 a.m. The Appellant, carrying a plate of food, got onto a second-floor elevator, took the elevator to the sixth floor, and stopped to eat in front of McKenzie and Banks's room. He entered their room at 3:14 a.m. and entered his own room down the hall at 3:27 a.m. At 3:37 a.m., the Appellant, in his "American flag underwear," came out of his room and went into the bathroom. At 3:44 a.m., he walked from the bathroom back to his room. He was wearing a towel around his waist and was carrying a shower caddie. At 3:48 a.m., the Appellant exited his room wearing shorts and shoes. He took the elevator to the first floor and let a female into the building. She followed him back to his room, and they entered his room at 3:50 a.m.

Meanwhile, Vandenburg let four men into the second-floor lobby of Gillette Hall at 3:21 a.m. Those men were identified as Deandre Woods, Chris Boyd, Dillon Van Der Wal, and Michael Retta. The five of them walked toward Vandenburg's room and left a few minutes later.

At 4:52 a.m., the victim came around the corner from Vandenburg's room and went into the bathroom. She was wearing a black top and had a white or light green towel around her waist. Shortly thereafter, she returned to room 213. At 8:08 a.m., the victim went into room 214, which was Jake Bernstein's room. The victim came out of Bernstein's room at 11:50 a.m. and exited Gillette Hall at 11:52 a.m. She and another female got into the black Mercedes, which was still parked in front of Gillette Hall, and the victim drove away.

On cross-examination, Lieutenant Harville testified that all four of the defendants were smiling as Vandenburg carried the victim into Gillette Hall and that the Appellant and McKenzie were "horseplaying" outside the first-floor elevator. After Vandenburg pulled the victim out of the elevator and into the second-floor hallway, he was laughing and appeared to video-record the victim with his cellular telephone. He also appeared to photograph the victim's crotch area. Banks stepped behind a wall as if he were trying to avoid being recorded by Vandenburg. Banks then pulled out his own cellular telephone and appeared to photograph the victim. Lieutenant Harville acknowledged that Vandenburg was not friends with the codefendants but that the four of them were football teammates.

Gerald Black testified that in June 2013, he was the Assistant Dean of Students and responsible for investigating and resolving violations of Vanderbilt University policy. On the evening of June 24, Dean Black viewed video "of a woman who appeared to be passed out or in some similar state being carried into a residence hall on campus by several male, male individuals." The next day, Dean Black interviewed nine students, including the four defendants. He did not speak with the victim. Dean Black interviewed the Appellant separately from the other students, and the Appellant wrote a brief statement, which Dean Black read to the jury. In the statement, the Appellant said that "my teammate Brandon arrived with what looked to be a drunk female. He asked for my assistance, and I helped him carry her to his room. After we laid the girl on the floor, I left to meet my girlfriend and we stayed the night there."

Dean Black testified that he audio-recorded the Appellant's interview, and the State played the recording for the jury. During the interview, the Appellant stated that as he was walking out of Gillette Hall with a female friend, McKenzie and Banks returned from "getting food." A car pulled up to Gillette Hall, and they "all just kind of coincidentally met up." Vandenburg asked for some help, opened the passenger door of the car, and carried the victim into Gillette Hall. The four defendants "all went up together to the second floor," took the victim into Vandenburg's room, and "[l]aid her on the floor and left her." The Appellant said he was in the room "[f]ive minutes maybe" and left to meet his girlfriend. Dean Black asked the Appellant if the victim was "pretty much passed out or mumbling and incoherent the entire time," and the Appellant answered yes. When Dean Black advised the Appellant that surveillance video indicated he was in Vandenburg's room at least thirty to forty minutes, the Appellant responded, "I

- 4 -

don't recall being there that long." The Appellant denied that he or anyone else in the room had sexual contact with the victim and denied consuming any alcohol prior to the incident.

On cross-examination, Dean Black testified that the defendants were not advised of their right to counsel and were not under oath during their interviews. Later that week, he placed them on interim suspension pending an investigation. He did not have further involvement with the case.

Detective Jason Mayo of the MNPD Sex Crimes Unit testified that on the afternoon of June 26, he went to the Vanderbilt University campus to gather information about the incident. Detective Mayo met with the victim at the Vanderbilt University Police Department, and the victim "[s]eemed normal and a bit confused." Detective Mayo's supervisor showed the victim some photographs, and she was "still somewhat dumbfounded and confused." Detective Mayo said that he usually tried to investigate sex crimes within seventy-two hours of the event so that physical evidence could be collected from a victim. Although eighty to ninety hours had elapsed in this case, Detective Mayo offered a physical examination to the victim, and she agreed. He met her at the hospital, and a nurse practitioner performed the examination and collected evidence for a rape kit. Detective Mayo then followed the victim to her residence. She went inside, gathered the clothing she had been wearing on the night of June 22, and gave him the clothing in a brown paper bag. The clothing consisted of a black two-piece dress and two pairs of panties. The victim told Detective Mayo that she could not remember which pair she had been wearing, "so she put both in the bag."

Detective Mayo testified that on June 27, he viewed surveillance video from Gillette Hall, which led him to believe that "something could have occurred" in room 213. He met with Vandenburg at the Vanderbilt University Police Department, and Vandenburg gave Detective Mayo his cellular telephone and the "unlock code" for the telephone. Detective Mayo also met with the Appellant. At that time, Detective Mayo had not seen any images from any cellular telephones or computers. The Appellant was free to leave during the interview and did so after he talked with the detective.

Detective Mayo audio-recorded the Appellant's interview, and the State played the recording for the jury. During the interview, the Appellant told Detective Mayo the following:

> So after we left over our friend's room, I went over to East with a female friend. And I went up to my room. [McKenzie] and Banks said they were about to go get some food. They left to go get the food. The female wanted to leave. I took her downstairs. And we -- just so happened we all met up downstairs. And from that point on, our friend pulled up with the female. You know, he was like, "Can y'all help me take her up,"

- 5 -

or whatever.  So I helped him get out the car, whatever.  Banks and [Vandenburg] went up with the girl.  I got my food from [McKenzie].  Then we went up to see, you know, if everything was all right.  So then they got into the room.  We went into the room and we was just in there talking.  And I left.  I met my girlfriend.

The Appellant said that the victim was on the floor, that she was mumbling, and that she had vomited.  Detective Mayo asked if anyone "mess[ed]" with the victim, if the Appellant put his penis or fingers inside of her, if anyone took photographs or video of her, and if anyone involved met to discuss their "story."  The Appellant answered each question in the negative.

Detective Mayo testified that he went to room 213 in Gillette Hall and that Vandenburg and Prioleau consented to a search.  The room was small with a set of bunk beds, a television, and a refrigerator, and bottles and clothing were scattered about the room.  Detective Mayo did not see any "blatant" evidence, so he had technicians "process the room as they knew how."  At that time, a water bottle was not significant to Detective Mayo, so he did not have the technicians collect any water bottles.

Detective Mayo testified that on June 28, he obtained numerous search warrants for cellular telephones, computers, and digital evidence.  He returned to room 213 and collected Vandenburg's laptop computer.  He also seized the Appellant's cellular telephone and searched the Appellant's room on the sixth floor.  The detective had noticed that the Appellant was wearing a white wristwatch in the June 23 surveillance video.  A white wristwatch was in the Appellant's room and resembled the one in the video.  Detective Mayo said that over the course of his investigation, he obtained cellular telephones belonging to Banks, McKenzie, and Boyd; the Appellant's cellular telephone records; and DNA samples from all four defendants, Woods, Boyd, Van Der Wal, Retta, and Prioleau.  On cross-examination, Detective Mayo testified that at one point during the surveillance video, the victim had her arm "draped" around Vandenburg.

Sharon Tilley testified that in June 2013, she was a crime scene technician with the MNPD.  On June 27, she processed room 213 for evidence and collected a white towel, two light green towels, and a red and white towel.  One of the light green towels had a stain on the edge, and the red and white towel smelled of urine and had brownish-colored stains on it.  On cross-examination, Tilley testified that she "did run a crime scene lamp and an alternate light source in the room" to check for bodily fluids and that she did not notice anything of value on the floor.  Tilley used the light source on the lower bunk but not the top bunk because she was advised that the top bunk was not part of the investigation.

Felicia Evans testified that she was a crime scene investigator with the MNPD and helped Tilley process room 213 for evidence.  Evans said that when she walked into the

room, she was "overtaken with the smell of urine, and the crime scene itself was very dirty, just riddled with trash, food bags, drink cans, water bottles, clothing, shoes were cluttered. The area where the towels were, it was just basically a mound of trash." A condom box and an unwrapped condom were in a desk drawer. Evans processed the room for fingerprints, and she obtained two fingerprints off the interior side of the door and two fingerprints off the condom box. She also swabbed numerous areas of the room, including "a cleared space on the floor," for any trace evidence. On cross-examination, Evans testified that she collected the bedding on the lower bunk and a sample of "vomit-like" crusty material that was on a plastic "tub" in the room.

Detective Chad Gish of the MNPD testified as an expert in computer and mobile device forensic analysis that he viewed the video surveillance from Gillette Hall, which provided him with a timeline of the June 23 events. The victim and the defendants were in room 213 from 2:37 to 3:05 a.m., so Detective Gish began analyzing digital devices for that timeframe. First, he analyzed Vandenburg's cellular telephone. He did not find any photographs or videos for the time the victim was in Vandenburg's room but found "evidence of several references to rape"; a one-minute and eleven-second call made to Joseph Quinzio; "some internet history that was very disturbing"; and evidence referencing Facetime, which Detective Gish described as "a video phone call." Regarding the telephone's internet history, Detective Gish found that Vandenburg had used Google to search "can police retrieve deleted picture messages."

Detective Gish testified that a "gap" of images was missing from Vandenburg's telephone, meaning that someone had deleted the images. Detective Gish could not recover the original images but was able to retrieve "thumbnails," which were miniature copies of the images. He then identified and described as follows the thumbnail photograph and video images he obtained: The first photograph image showed the victim lying face-down outside a dormitory room or elevator. She was not wearing any underwear, her buttocks were "reddened," and a plate of food was to her left. The second photograph image showed the victim on the floor of Vandenburg's room. The Appellant had removed his jeans and was wearing American flag underwear. A water bottle was to his right, and he appeared to be "mounting" the victim. Another photograph image showed the victim lying on her back in the room. She was not wearing any underwear, her legs were spread open, and Banks appeared to be holding a cellular telephone and taking photographs of her. In the first video image, the victim was lying on her stomach. She was not wearing any underwear, her legs were spread open, and the Appellant was touching her "private area." In the second video image, the victim was lying on her left side, her underwear was pulled down but not removed, and "she has a bottle inserted in what appears to be her anus." In the third video image, the victim was lying on the floor of the room, and the Appellant "appears to be inserting his finger in one of her orifices." In the fourth video image, the Appellant was on his knees with his pants pulled down, exposing his American flag boxer shorts, and his hands were near his groin.

Detective Gish testified that he also obtained thumbnail images from the Appellant's cellular telephone; the original images had been deleted. A video image showed the victim lying on her back with her vagina exposed. A photograph image showed Banks using his left thumb to pull open the victim's vagina so he could take a photograph with his telephone, which was in his right hand. Another photograph image showed the victim lying on her stomach in the room, and she had a red handprint on her left buttock and redness on her right buttock. In another photograph image, the Appellant, wearing the white wristwatch, was spreading open the victim's buttocks, exposing her anus and vagina. Detective Gish also obtained photograph images from Banks's telephone. He said that one image appeared to show the Appellant's finger in the victim's anus and that another image showed the victim lying on her back with the Appellant "squatting" over her and his anus "sitting on top of her face." Detective Gish did not obtain any photograph or video images related to this case from McKenzie's telephone.

Detective Gish testified that after he analyzed the telephones, he analyzed Vandenburg's computer and discovered that someone had accessed several pornography websites while the victim and the defendants were in room 213. Next, Detective Gish began trying to determine if Vandenburg sent any videos from his telephone to other people and identified two possible individuals: Miles Finley and Joseph Quinzio. Finley and Quinzio lived in Vandenburg's hometown of Palm Desert, California, and had played junior college football with him. On July 23, 2013, Detectives Gish and Mayo flew to Palm Desert. They met with detectives from the Palm Desert Police Department and obtained search warrants for Finley's and Quinzio's electronic devices. Detective Gish said he and Detective Mayo went to Quinzio's house first and seized two cellular telephones and a computer. Detective Gish also found a receipt for a recently-purchased cellular telephone. The detectives then went to Finley's house. Finley was not there, but Detective Gish talked with him on the telephone, and he agreed to return home. When he arrived, Detective Gish removed Finley's cellular telephone from his person. Finley told Detective Gish that he had just "wiped" that telephone "because there may have been inappropriate images of he and his girlfriend." As a result, Detective Gish was unable to obtain any evidence from that device.

Detective Gish testified that when he returned to Nashville, he analyzed Quinzio's telephone and computer. He found three videos of the victim that Vandenburg had sent from Vandenburg's telephone. The State played the videos for the jury while Detective Gish explained what was depicted in the videos: The first video showed the victim lying in the hallway outside the second-floor elevator in Gillette Hall. Her skirt had been removed or pulled up, and Banks was taking photographs of her "private areas." The second video showed the victim on the floor of room 213 and "[w]hat appeared to be" the Appellant's finger in her anus. The third video showed the victim lying on the floor with a bottle in "[w]hat appeared to be" her anus. Someone in the room said, "'Squeeze that shit, squeeze that shit.'" Banks twisted and squeezed the bottle. Detective Gish said that

the Appellant then appeared to have sex with the victim because "he's mounted up to her, right where her vagina would be." Detective Gish stated that "we hear laughing and cutting up" in the room and that someone said, "'You ain't even hard, bro.'" Further analysis of Quinzio's computer showed that on June 26, 2013, Vandenburg and Quinzio had a text message conversation in which Vandenburg asked Quinzio to send the videos back to him. Quinzio returned only two of the three videos.

Detective Gish testified that he analyzed the victim's telephone. On June 23, 2013, Jake Bernstein placed a "missed" called to the victim at 2:55 a.m. The victim called Bernstein at 7:54 a.m.

Detective Gish testified about text messages he extracted from the Appellant's telephone. At 6:22 p.m. on June 23, the Appellant texted Boyd, "'Everything still good?'" Boyd replied, "'Yeah, man, as far as I know.'" In a conversation with Boyd on the afternoon of June 24, the Appellant asked Boyd, "'We still good? I'm stressing.'" Boyd replied, "'As far as I know.'" The Appellant then asked Boyd if the video had been "'deleted'" and if Boyd had talked to "'her.'" Boyd replied that "'she doesn't know that anything happened but she passed out in Vandenburg's bed. . . . Van Der Wal helped us move her out of the hallway.'" The Appellant told Boyd, "'Tell him don't say nothing to anybody.'" Boyd answered, "'He knows.'" In a conversation with an individual named Antonio Richardson on the night of June 25, the Appellant stated that he was probably going to be "'kicked off'" the football team. Richardson asked what was going on, and the Appellant answered, "'They trying to say I raped a bitch with some other teammates. I got to leave Nashville, bro. I can't come back. . . . We just helped the bitch to her room because who she was with he was too drunk. I need your help, bro. I know I'm gone.'" In another conversation with an unidentified individual on the night of June 25, the Appellant stated, "'They are trying to say we raped this bitch Saturday night. We helped a friend carry her to his room because he was drunk too.'" The person responded, "'I was with you that night and I saw [McKenzie] and Brandon the next morning. I can stick up for y'all. Y'all weren't acting weird at all and if you had done anything bad you would have been acting weird.'"

On cross-examination, Detective Gish testified that at 10:26 p.m. on June 22, 2013, the Appellant received a text message asking, "'[W]hat you getting into tonight[?]'" The Appellant responded that he did not know yet and that "'I'm just drinking now.'" Detective Gish acknowledged that some of the photographs and videos from the defendants' telephones appeared to depict the same acts from different angles. He also acknowledged that when the Appellant appeared to be "mounting" the victim, his boxer shorts were on and his penis was not visible. Likewise, the Appellant's penis was not visible when his anus was on the victim's face.

Jaborian McKenzie testified that at the time of the Appellant's trial, he was twenty-one years old, a senior majoring in Ag-Business at Alcorn State, and out on bond

in this case. In June 2013, he was eighteen years old, was attending Vanderbilt University on a football scholarship, and had never been convicted of a crime. He said that he and the Appellant were best friends, that the Appellant had a "strong personality," and that the Appellant was a "leader." McKenzie and Banks were roommates, and they too were best friends. McKenzie did not know Vandenburg. McKenzie said he was "not happy" about testifying against the Appellant.

McKenzie testified that on the night of June 22, he was in his room with Banks and the Appellant and that they were "[h]anging out," drinking alcohol, and listening to music. McKenzie drank two or three Lime-A-Ritas and one or two cups of vodka, and the Appellant drank "[a]bout the same." At some point, the three of them went to "a little gathering" at East Hall. They continued to drink alcohol and were "buzzed" when they went back to Gillette Hall, but they were able to function on their own and did not have any trouble walking or understanding each other. McKenzie and Banks returned to their room, and the Appellant and a female friend went to the Appellant's room. McKenzie and Banks decided to go and get food from Qdoba, and they agreed to bring back food for the Appellant.

McKenzie testified that he and Banks arrived back at Gillette Hall with the food about thirty minutes later and saw the Appellant and his female friend. Vandenburg approached, said a girl was "passed out" in a car, and said he needed help getting her to his room. McKenzie stated that he was the last person to enter Vandenburg's room and that the victim was "passed out" on the floor and not making any sounds. Vandenburg tried to wake his roommate and stated that "we were going to [f*ck] this bitch." Vandenburg got some condoms out of a dresser and passed them out to his codefendants. McKenzie took one condom and put it into his pocket.

McKenzie testified that the Appellant penetrated the victim vaginally and anally with his fingers while Vandenburg was "egging on." The State asked McKenzie who put the bottle into the victim. McKenzie said that he was "not sure" but that Banks squeezed the bottle. The State then asked, "Who appeared to be on top of [the victim], attempting to have sex?" McKenzie said the Appellant. McKenzie stated that after the Appellant tried to have sexual intercourse with the victim, the Appellant said that "he'd never had ass ate before." The Appellant sat on the victim's face and put his penis into her mouth. The State showed McKenzie a photograph, and he said it showed the Appellant "attempting" to put his penis into the victim's mouth. The Appellant then tried to have sexual intercourse with the victim again. The State asked McKenzie how he knew the Appellant was trying to have sex with the victim, and McKenzie answered that the Appellant was on top of the victim, between her legs, and making "[s]exual movements." The Appellant "started to slap" the victim, and McKenzie told everyone that she was going to "wake up." Vandenburg responded that the victim was not going to "wake up," reached over, and slapped her buttocks "pretty hard." At some point, Vandenburg put pornography on his laptop computer, touched himself, and said he "couldn't get a hard on

- 10 -

because he'd done so much coke." McKenzie said the last thing that happened to the victim was that the Appellant said he was going to "piss" on her. The Appellant urinated on the victim. McKenzie stated that he never touched the victim and that Vandenburg's roommate was asleep in his own bunk during the entire incident.

McKenzie testified that he, Banks, and Vandenburg went into the bathroom and that he and Banks were "freaking out from what happened in the room." Vandenburg flushed the condoms down the toilet and told them, "'Calm down, chill. It's going to be okay.'" He also told them that "he had done it before" and that "his dad beat a rape case." The three of them returned to Vandenburg's room, and Vandenburg asked Banks and McKenzie to take the victim back to her car. Banks and McKenzie did not want to be seen on the security camera, so Vandenburg put a towel over his face and covered the camera with the towel. McKenzie and Banks ran out of room 213 and returned to their room. At that time, the victim was lying outside room 213. McKenzie identified a photograph of the victim lying on her stomach outside the room and said the photograph showed "red marks" on her "behind." McKenzie said the Appellant joined him and Banks in their room. The Appellant was "on his phone" and was talking "[i]n a normal fashion." Later that morning, McKenzie asked the Appellant if he "[got] it in," and the Appellant answered yes.

McKenzie testified that he and his codefendants were questioned by Student Conduct. Afterward, they went to a Popeye's restaurant, and "we all asked each other what we told Student Conduct. And we, pretty much, told them the same thing; everything that happened in the room, except for the bad stuff. And we said we was going to stick with that until further notice." McKenzie said he lied to Dean Black, the police, and even the attorneys in the district attorney's office because he was ashamed of what had happened in room 213; because his family members told him "not to tell anything that couldn't be proven"; and because "it was just hard to tell on my two best friends at the time." He said that he was hoping for "[s]ome type of consideration" in exchange for his testimony but that the State had not promised him anything.

On cross-examination, McKenzie acknowledged that he lied to Dean Black on June 25 and Detective Mayo on June 27, 2013, when he told them that "nothing happened" with the victim. McKenzie talked with Detective Mayo again on July 17, 2013, and was partially truthful. For example, he truthfully told Detective Mayo that the Appellant was "really drunk" and that the Appellant "'peed on her [but] didn't even know what he was doing.'" However, he lied to the detective by claiming that he did not think the Appellant had sex with the victim, that he did not think the Appellant put his penis into her anal area or mouth, and that he did not see any condoms.

McKenzie testified that on September 14, 2014, he and his attorneys met with attorneys from the district attorney's office. By that time, McKenzie had been indicted and had seen the evidence against him, so he decided to tell the truth. McKenzie told the

prosecutors that the Appellant was "drunk," that the Appellant put his finger inside the victim, and that the Appellant tried to get a "hard on" by putting his penis into her mouth. McKenzie acknowledged that he previously had stated "over and over" that he never saw the Appellant's penis. Defense counsel asked him, "But now you are certain you saw it?" McKenzie answered, "I saw him grab his penis area, trying to put it in [her mouth and vagina]."

McKenzie acknowledged telling the prosecutors that the Appellant "put his butt in her face" and "went back down, got between her legs, and attempted to have sex with her." Defense counsel asked if McKenzie was "certain" the Appellant had sex with the victim, and McKenzie answered, "Well, he told me the day after." McKenzie also acknowledged telling the prosecutors, "'Banks only placed the bottle near her vagina but [the Appellant] shoved it in there[.]'" Defense counsel asked if McKenzie saw the Appellant put his finger into the victim's anus and vagina, and McKenzie answered, "Yes, ma'am. The pictures clearly show it."

On redirect examination, McKenzie testified that he saw the Appellant put the Appellant's penis into the victim's mouth. On recross-examination, McKenzie clarified that he never saw the Appellant's penis that night but that he saw the Appellant "holding his penis area and placing it in her mouth."

Mack Prioleau, a student at Vanderbilt University, testified that on June 23, 2013, he was eighteen years old and a member of Vanderbilt's football team. He had been living in Gillette Hall for two to three weeks, and Vandenburg was his roommate. They did not know each other before becoming roommates.

Prioleau testified that on the night of June 22, he drank two sixteen-ounce beers and went to sleep in his top bunk about midnight. Sometime in the early morning hours of June 23, he was awakened by the lights being turned on and saw Vandenburg and three other football players in the room. He later learned those football players were Banks, the Appellant, and McKenzie. Prioleau also saw a woman he did not recognize lying face-down on the floor. He said he "rolled back over" and "heard sexual things going on." Specifically, he heard "people use the F-word, referring to having sex with this woman" and "pornography playing in the background." Prioleau also heard "a little bit of laughter here and there" and heard Vandenburg say he could not get an erection "due to the use of cocaine."

Prioleau testified that at some point, he realized no one was in the room. He got up and left as fast as he could. As he was leaving, he saw the victim lying on Vandenburg's bed. Prioleau said that he never heard her say anything, that she was "still," and that she appeared to be unconscious. Prioleau saw Boyd in the second-floor hallway, and Prioleau went to a friend's room on the sixth floor. He returned to room 213 about noon, but no one was there. Vomit was on the floor, so Prioleau used a

Swiffer mop to remove it and "what else was on the floor." Later that day, Vandenburg sent Prioleau a text message, asking if Prioleau could leave the room so Vandenburg "could be with another girl." Prioleau did so.

Prioleau testified that he spoke with Detective Mayo. Afterward, he saw Banks, the Appellant, and McKenzie outside Gillette Hall. Banks asked if Prioleau could "help him out," and Prioleau said okay and walked off. Prioleau consented to a search of his room, and his father hired a lawyer. Prioleau later signed a Use Immunity Agreement so that he could tell the truth without it being used against him.

On cross-examination, Prioleau testified that he no longer played football for Vanderbilt. Prior to June 23, 2013, he recognized the Appellant as a football player but did not know the Appellant's name. During the incident in room 213, Prioleau was "in and out of sleep" and "tried just to block it out and not see anything." He said that he was alone in the room with the victim for a certain amount of time but that he did not know how long he was alone with her. When Prioleau returned to the room later that day, he saw vomit on the floor and on a cooler that belonged to him.

Joseph Quinzio testified that in late June 2013, he was eighteen years old, living in Palm Desert, California, and Vandenburg's friend. They went to high school together, and Quinzio had known Vandenburg six or seven years. On the night of June 22 or in the early morning hours of June 23, Quinzio received a call and text messages on his cellular telephone from Vandenburg. Quinzio's telephone was wirelessly connected to his computer, so the text messages also went to his laptop. Quinzio described the messages as "out of character and surprising, as a friend, to see." Vandenburg also sent Quinzio three videos, which Quinzio described as "very surprising" and "very horrific, in some of the actions that were done there." In the first video, Quinzio saw an unconscious woman and other people around her. The second and third videos appeared to have been recorded in a dormitory room. The room was dark, the unconscious woman was on the floor, and three men were around her. A fourth man, Vandenburg, was recording. Quinzio said that he did not recognize the woman or the three men but that he recognized Vandenburg by Vandenburg's voice. Quinzio deleted the videos from his cellular telephone "right away" and went to sleep.

Quinzio testified that a couple of days later, Vandenburg did not remember sending the videos and asked that Quinzio send them back to him. Quinzio returned two of the videos, which were still on his computer. The third video had been deleted. At some point, Vandenburg returned to Palm Desert. He destroyed Quinzio's cellular telephone and bought him a new one. Vandenburg also "insisted on coming over to wipe the computer of the information, and was unsuccessful at that."

Quinzio testified that Nashville detectives came to Palm Desert to talk with him and that he told the detectives he had lost his telephone. Quinzio said he lied to the

detectives because he was scared and because he was "coerced" by Vandenburg and Vandenburg's attorney. Quinzio was later charged with tampering with evidence for deleting the videos and for attempting to erase his computer. He entered a conditional guilty plea to being an accessory after the fact and received a sentence of eleven months, twenty-nine days to be served on unsupervised probation. At the time of the Appellant's trial, Quinzio had completed his probation and was attempting to have the conviction removed from his record.

On cross-examination, Quinzio acknowledged that one of Vandenburg's text messages said, "'I'm a make sure I F-U-C-K tonight.'" Quinzio responded to Vandenburg, "'Call me during.'" Quinzio acknowledged that after this incident, Vandenburg told him what to do and that he felt threatened by Vandenburg.

On redirect examination, Quinzio testified that he did not fear physical harm from Vandenburg but that he was afraid for Vandenburg because they were still friends and he thought Vandenburg was innocent. On recross-examination, Quinzio testified that Vandenburg asked for Quinzio's telephone. When Quinzio refused to give it to Vandenburg, Vandenburg took the telephone out of Quinzio's car. Quinzio acknowledged, though, that he consented to Vandenburg's accessing his laptop computer.

Deandre Woods testified that he was a student at Vanderbilt University. In June 2013, he was on a football scholarship, lived on the fourth floor of Gillette Hall, and had been on campus two or three weeks. He knew Vandenburg from the football team but did not socialize with him.

Woods testified that on the night of June 22, he went to Tin Roof. He did not remember seeing Vandenburg there. Woods left Tin Roof in the early morning hours of June 23, returned to Gillette Hall, and "stumbled across" Boyd, Van Der Wal, and Retta. The four of them entered the second floor of Gillette Hall, and Woods saw the victim lying on the floor outside room 213. The victim was "unclothed and unconscious." Boyd told Woods to help get the victim into Vandenburg's room, so Woods picked her up by her shoulders while Boyd picked her up by her ankles. They put the victim on Vandenburg's bed, and Boyd covered her with blankets. Woods said he did not touch any other part of her body or photograph her. Boyd told Woods to get out of the room, so Woods went to his room on the fourth floor. On cross-examination, Woods testified that he did not remember seeing Prioleau in room 213.

Dillon Van Der Wal testified that in June 2013, he was a junior at Vanderbilt University and on the football team. Van Der Wal and Boyd were neighbors in East Hall. Van Der Wal knew Vandenburg and the Appellant.

Van Der Wal testified that in the early morning hours of June 23, Boyd received a telephone call from Vandenburg. In response to the call, Boyd, Van Der Wal, and Retta

went to Gillette Hall and entered the building on the second floor. They walked down the hall to Vandenburg's room, and Van Der Wal saw the victim lying face-down on the floor. Her dress was around her stomach area, she was nude from the waist down, and she had "handprints on her butt." Van Der Wal noticed that a towel was draped over a surveillance camera in the hallway.

Van Der Wal testified that Vandenburg, Boyd, and Deandre Woods picked up the victim and carried her into the room. Van Der Wal did not touch the victim. He walked into Vandenburg's room briefly and saw Prioleau get out of Prioleau's bed and walk out of the room. Van Der Wal, Boyd, Retta, and Vandenburg then walked to East Hall. Van Der Wal said that Vandenburg was "definitely intoxicated" but that Vandenburg "wasn't overly intoxicated where he needed assistance." Van Der Wal had an extra bed, so Vandenburg stayed in Van Der Wal's room that night.

On cross-examination, Van Der Wal testified that at the time of the incident, he and the victim were friends. Van Der Wal acknowledged that he cared for the victim's safety and welfare but that he did not call security for her. Van Der Wal did not see the Appellant in Vandenburg's room.

Courtney Heard testified that in June 2013, she was a student at Vanderbilt and lived off campus with Quela Royster and Gozie Nkema. Heard knew the Appellant. In the early morning hours of June 23, Heard and Nkema went to the Appellant's room in Gillette Hall to get Royster because they wanted Royster to go home with them. Heard knocked on the Appellant's door, and he answered wearing American flag boxer shorts. Heard said that she and Nkema stood outside the Appellant's door for thirty or forty minutes while they were waiting on Royster and that she heard the Appellant and Royster "murmuring" inside the room.

Julia Hooper testified as an expert in fingerprint analysis that she worked for the MNPD Crime Laboratory and compared the fingerprints found in room 213 to the defendants' fingerprints. The fingerprints on the interior side of the door did not match any of the defendants. However, the fingerprints on the condom box matched McKenzie and Banks.

Special Agent Forensic Scientist Charly Castelbuono of the Tennessee Bureau of Investigation (TBI) testified as an expert in DNA analysis that she analyzed evidence collected in this case, including the victim's rape kit, the victim's clothing, and towels and bedsheets from room 213. She also compared DNA found on the evidence to the defendants' DNA. Agent Castelbuono found a small amount of sperm on the victim's vaginal swabs. The DNA on the swabs matched the victim and Vandenburg, and Agent Castelbuono eliminated the Appellant, Banks, and McKenzie as contributors. Agent Castelbuono did not find any sperm on the victim's top or skirt but found one sperm on each pair of the victim's panties. Given that semen contained an average of 200 to 500

million sperm per ejaculation, Agent Castelbuono opined that the single sperm on each of the panties was "not consistent with an actual semen stain being present" and may have been the result of a transfer from another surface.

Agent Castelbuono testified that she found non-sperm DNA and sperm DNA in two stains on a green towel. The non-sperm and sperm DNA in the first stain matched Vandenburg. The non-sperm DNA in the second stain was a mixture of two individuals with the major contributor being Vandenburg. Agent Castelbuono could not determine the minor contributor due to insufficient or degraded DNA. Agent Castelbuono also found non-sperm DNA and sperm DNA in two stains on a second green towel. The non-sperm DNA in the first stain was a mixture of at least two individuals with the major contributor to the mixture being an unknown male. Agent Castelbuono could not eliminate Vandenburg as the minor contributor but eliminated the victim, the Appellant, Banks, and McKenzie. The sperm DNA did not match any of the defendants. The non-sperm DNA and sperm DNA in the second stain matched Vandenburg. Agent Castelbuono did not find any semen on a red and white towel.

Agent Castelbuono testified that she found non-sperm DNA and sperm DNA on a fitted bedsheet from the lower bunk. The non-sperm DNA was a mixture of the victim's and Vandenburg's DNA, and the sperm DNA matched Vandenburg. Agent Castelbuono found three stains on the mattress cover for the lower bunk. The non-sperm and sperm DNA in the stains was from an unknown male, and all four defendants were eliminated as contributors. Agent Castelbuono acknowledged that she did not conclusively find the Appellant's DNA on any of the evidence. She also acknowledged that she probably would not have expected to find his DNA if he was wearing a condom.

On cross-examination, Agent Castelbuono testified that it would have been "preferable" for the victim's panties to have been bagged separately. She acknowledged that she did not find any semen on swabs collected from the floor of room 213 or in the crusty material on a tub in the room. She did not test any of the items for urine, noting that "[w]e don't have a test for urine at the TBI."

Lauren Miller testified that in June 2013, she lived in the Village at Vanderbilt and was the victim's roommate. Miller and the victim were on Vanderbilt's dance team, and Miller had known the victim for a couple of years. On the night of June 22, Miller and the victim were at their apartment. They consumed some mixed drinks and mingled with friends. They then went to Tin Roof and arrived about midnight. Miller saw Vandenburg near the entrance. She had seen him around campus previously but did not know him very well. Vandenburg "seemed excited" to see the victim, immediately walked up to her, and handed her a drink. Miller stayed at Tin Roof only five or ten minutes.

Miller testified that she did not see the victim again until the early afternoon of June 23 and that she was "shocked" by the victim's appearance. The victim "seemed to be very disheveled," and Miller noticed a few things that were "a little bit strange." For example, the victim's hair was very matted "as if it had gotten wet and then been dried again, which was confusing to us, because we didn't know how it had gotten wet." The victim also had "puke" crusted in her hair and on her shirt, and her shirt "felt very stiff, similar to her hair, as if it had gotten wet and then been dried." The victim had a gash on her knee and several bruises on her legs, and they wondered what had happened to the victim.

Miller testified that the victim found one of the victim's shoes on the lawn outside their apartment. The victim was "very, very ill" and "kept getting progressively sicker throughout the rest of the day." A couple of days later, Miller took a photograph of the victim because the victim had "a ton" of bruises on the backs of her legs and was complaining about pain.

On cross-examination, Miller testified that she and the victim were drinking gin before they went to Tin Roof but that she did not know how much alcohol the victim consumed. After the victim got home on June 23, she changed clothes, and she and Miller went to eat at Pancake Pantry. Miller did not smell the victim's hair, so she did not know if it smelled like urine.

Kathyrn Parnell, a nurse practitioner, testified as an expert in forensic sexual assault examinations that she examined the victim at Vanderbilt Hospital on June 26, 2013. The victim told Parnell that the alleged assault had occurred on June 23 and that the last thing she remembered was talking to friends at Tin Roof about midnight. The victim awoke about 8:00 a.m. in Vandenburg's room.

Parnell testified that she typically examined victims within seventy-two hours of an assault. Although this incident occurred outside that timeframe, it was still possible to obtain DNA evidence, "just not as likely." The victim was unable to give Parnell any information about the alleged assault. The victim did not know if her vagina, mouth, or anus had been penetrated, if ejaculation had occurred, or if a condom had been used. The victim also had showered since the incident, which affected the collection of evidence. The victim reported that she voluntarily had vaginal intercourse with Vandenburg about 5:00 p.m. on June 23 and that he did not wear a condom.

Parnell testified that the victim was calm and composed but complained about shoulder pain. Parnell did not notice anything unusual about her appearance or behavior. The victim had a scabbed wound that measured three centimeters by three centimeters below her knee. She also had numerous purple and red bruises on her buttocks and thighs and scratches on her ankles. Parnell did not see any trauma during the victim's pelvic exam, and Parnell could not determine if penetration had occurred. She collected

evidence for a rape kit and gave the kit to Detective Mayo. Because the victim was unable to remember what happened during a certain period of time, Parnell also collected blood to test for two drugs commonly associated with sexual assault. She explained, "It is difficult to detect those [drugs] in the blood after twenty-four hours, but I ordered them anyways, out of an abundance of caution."

On cross-examination, Parnell acknowledged that the victim said she consumed "quite a bit of alcohol, mixed drinks and shots" before the alleged assault. Parnell also acknowledged that she did not see any signs of physical trauma to the victim's head, face, neck, breasts, abdomen, or rectum. The victim reported to Parnell that she was taking oral contraceptive pills and fluoxetine, which Parnell described as an antidepressant. On redirect examination, Parnell testified that the absence of injury to the victim's vaginal and anal areas was not significant due to the elasticity of those areas.

The victim testified that in June 2013, she was a student at Vanderbilt University and was living in the Village at Vanderbilt, an off-campus apartment complex. On the night of June 22, the victim spent some time at her apartment with her roommate and some friends before going out. The victim consumed one mixed drink at her apartment and then everyone took a cab to Tin Roof bar. Vandenburg was there. The victim said that she had known Vandenburg about two weeks and that they were in "sort of a casual dating relationship."

The victim testified that an older woman was with Vandenburg and that Vandenburg said the woman was buying people drinks. Vandenburg asked the victim what she wanted, and she told him a gin and tonic. The victim saw the bartender hand the drink to Vandenburg, and Vandenburg handed the drink to the victim. Next, the victim drank a shot of whiskey and a Red Bull and vodka. She said that while she was turned away talking to people, Vandenburg "appeared with a blue drink in a clear cup." The victim told the jury, "[H]e said out in California, this is our version of the Long Island Ice Tea and it's so good, you have to try it, you have to try it." The victim took two or three sips of the drink.

The victim testified that the next thing she remembered was waking up in a room about 8:00 a.m. She was in a bed, her clothes were on, and her telephone and keys were on top of a dresser. However, her purse and shoes were gone. The victim was in a lot of pain, particularly in her left shoulder and left wrist, and had an "injury" on her knee. She felt sick and started to get a headache. The victim walked out of the room and realized she was in Gillette Hall. She recognized Jake Bernstein's door and knocked on it. Bernstein opened the door, and the victim went into his room for "a little bit." She spoke with a friend on the telephone, and her friend came to Gillette Hall and Bernstein's room. The victim and her friend left Gillette Hall between 11:00 a.m. and 12:00 p.m. The victim's Mercedes was parked in front of the dormitory, so the victim and her friend got into the car. Blood was smeared across the glove box, and the victim's purse was on the

passenger-side floorboard. The victim drove to her apartment. When she arrived, she saw that one of the shoes she had been wearing the night before was on the lawn outside her apartment.

The victim testified that she was "sore everywhere," felt ill, and had a headache. She was disoriented and felt worse as the day progressed. The victim had texted Vandenburg that morning to find out what had happened. He texted her back throughout the day, giving her his version of the events. Vandenburg claimed that the victim got sick in his room and that he spent the night taking care of her. He also claimed that he cleaned up her "mess" and that "it was so horrible for him." He asked her several times to come back to his room, so she went there about 5:00 p.m. They talked for a while, and then he "suddenly started being very nice and then eventually he kind of suddenly initiated intercourse." Vandenburg did not use a condom and ejaculated in the victim's vagina.

The victim testified that on Wednesday, June 26, she learned about the investigation and more about what happened on June 23. However, she did not learn about what happened in room 213 until weeks later. She said that she had never been in Vandenburg's room prior to June 23 and that she did not remember or consent to anything the defendants did to her.

On cross-examination, the victim acknowledged that video surveillance showed her going into the bathroom in Gillette Hall about 5:00 a.m. She said, though, that she did not remember anything until she awoke at 8:00 a.m. The victim said that she did not notice her head smelling like urine and that she had never had sex with Vandenburg prior to the afternoon of June 23.

At the conclusion of the victim's testimony, the State rested its case and made the following election of offenses: count one, aggravated rape, related to digital penetration of the victim's vagina by the Appellant; count two, aggravated rape, related to digital penetration of the victim's anus by the Appellant; count three, aggravated rape, related to fellatio of the victim's mouth or lips by the Appellant; count four, aggravated rape, related to penile penetration of the victim's vagina by the Appellant; count five, aggravated rape, related to penetration of the victim's anus with an object by Banks; count six, aggravated sexual battery, related to the touching of the victim's primary genital area by Banks; and count seven, aggravated sexual battery, related to the Appellant's placing his buttocks on the victim's face. The election for each count stated that the offense occurred while the victim was unconscious on the floor of a dormitory room in Gillette Hall on the Vanderbilt University campus.

Sara Enoch testified that she was a student at Samford University in June 2013 and that she dated the Appellant for about two and one-half years. In the early morning hours of June 23, the Appellant telephoned Enoch and asked her to come to Vanderbilt

University. The Appellant sounded "drunk" and previously had never asked Enoch to come over "in the middle of the night." The Appellant was "insistent," so Enoch went to Gillette Hall. She said that she spent the night with him and that she did not think they had sex. On June 25, Enoch sent the Appellant the following text: "'I was with you that night and I saw [McKenzie] and Brandon the next morning. I can stick up for y'all. Y'all weren't acting weird at all. If you had done anything bad, you would've been acting weird.'" Defense counsel asked what she meant by that text, and she answered, "I just meant that I didn't think anything was out of the ordinary and that if anybody were to ask me about that night, then that's what I would say." Defense counsel asked if the Appellant normally used the word "bitch," and Enoch said, "Yeah. If he's upset about something or if he's angry."

On cross-examination, Enoch testified that she arrived at Gillette Hall about 3:47 a.m. and that the Appellant was acting "[o]verly nice." Otherwise, she did not notice anything unusual about him. Enoch acknowledged that she may have said previously that she thought the Appellant was intoxicated because he was slurring his words. At the time of his trial, though, she did not remember him having slurred speech. Enoch left later that morning, before the Appellant and McKenzie went to church. The State asked if Enoch was aware that Vanderbilt's wide receivers coach required them to go to church, and Enoch said no. She acknowledged that she continued to have a relationship with the Appellant after this incident.

Special Agent Forensic Scientist April Bramlage of the TBI Crime Laboratory testified as an expert in toxicology. Pursuant to a request from Detective Mayo, Agent Bramlage analyzed the victim's top, a green towel, a red and white towel, and a crusty material for "any sort of biological material." Agent Bramlage then tried to "extract any drugs" from the material. The victim's top, the green towel, and the crusty material were negative for drugs. The red and white towel was positive for fluoxetine, also known as Prozac. Agent Bramlage acknowledged that the Crime Laboratory could test blood and urine for some "date rape drugs" but that she did not receive the victim's blood or urine for testing.

Quela Royster testified that in June 2013, she was a Vanderbilt University student and had known the Appellant about one month. She stated that they were "mainly friends" but that they also were "hanging out more in a romantic way." On the night of June 22, Royster was at East Hall and walked the Appellant to his room in Gillette Hall. The Appellant was intoxicated and was leaning on Royster as they were walking. When they got to the Appellant's room, the Appellant was trying to do sexual "stuff" with Royster. Royster told him to stop, and he did so. At some point, Royster's two roommates arrived at the Appellant's room and wanted her to leave with them. Royster was very "irritated" with her roommates but told them she would meet them at their car. About five minutes later, Royster and the Appellant left his room to go downstairs.

On cross-examination, Royster testified that she also had been drinking alcohol on June 22. Royster said that she never actually saw the Appellant consume alcohol that night and acknowledged that she may have told the district attorney's office that the Appellant "wasn't falling down drunk." She said that she did not remember the Appellant's taking off his clothes and just wearing his boxer shorts when they got to his room. However, he ordered food. Royster agreed to go home with her roommates, so she and the Appellant walked downstairs and outside. Royster acknowledged that she hugged the Appellant and looked into the black Mercedes. She also acknowledged that a woman was in the Mercedes and that the woman was "passed out."

The Appellant testified that he arrived on the Vanderbilt University campus in 2012 and that he had no criminal history. In June 2013, he was nineteen years old and drank alcohol "[o]ccasionally" with friends. On the night of June 22, the Appellant consumed "six or so" alcoholic drinks containing "Honey Jack" in McKenzie and Banks's room. He said that he was in the room for thirty to ninety minutes and that he had never consumed that much alcohol in such a short amount of time. He said that he remembered leaving their room and that "stuff . . . started to get fuzzy." The three of them went to East Hall, and the Appellant consumed "at least four or so" alcoholic drinks containing vodka. The Appellant went to use the restroom and realized he was "really drunk." He told the jury, "After that, everything really, really started to set in. Everything was really just black, and you know, I was really feeling the alcohol at that point." The Appellant said that he remembered "making it to the parking lot" and that he consumed "[m]aybe four or so" Lime-A-Ritas in the parking lot.

Defense counsel played surveillance video that was recorded at 1:28 a.m. on June 23. The Appellant testified that the video showed him "holding the wall" and Quela Royster "kind of guiding [him]."[1] The Appellant said he did not remember walking with Royster to his room, ordering food, walking Royster out of Gillette Hall, or calling Sara Enoch. He stated that the next thing he remembered after drinking the Lime-A-Ritas was McKenzie coming into his room sometime before 11:00 a.m. and waking him. The Appellant dressed for church, left for church with a football player named Bryan, and received a telephone call from McKenzie. As a result of McKenzie's call, the Appellant looked through his telephone and saw photographs of the victim, whom he did not know. The Appellant said that he did not know what happened to the victim and that he was "just kind of distraught and confused [about] how those images got there." He immediately deleted the photographs.

The Appellant testified that after church, he texted Boyd and told Boyd that he was "stressing." The Appellant explained to the jury, "I didn't know what was going on. People had continued to, you know, rumors were going around, people were knocking on

---

[1] Although defense counsel played the video in open court, counsel did not introduce the video into evidence.

my door, people coming. I was confused." The Appellant acknowledged that he asked Boyd, "'Have you talked to her?'" The Appellant said he asked Boyd about the victim because he did not know if Boyd knew her or had talked to her. The Appellant acknowledged referring to the victim as "bitch" in some of his texts. He said that he did so "solely out of frustration" and that "I would never intend on calling a woman that."

The Appellant testified that he heard about a video and that he was concerned because he did not know what was in the video. On June 24, he "met up" with McKenzie and Banks, and they told him what to say if questioned. The Appellant gave a statement to Student Conduct on June 25 based on the information that Banks had "supplied" to him, and the Appellant was suspended from the football team on June 26. On June 27, the Appellant met with Detective Mayo. The Appellant asked Detective Mayo if he needed an attorney, and Detective Mayo told him no. The Appellant said he told Detective Mayo "the story . . . that we had formulated, that Banks had told me, what I told to Student Conduct, I just told him the same thing."

The Appellant acknowledged that he was in various photographs and videos introduced into evidence by the State. Defense counsel asked, "Do you remember any of that?" The Appellant answered, "I don't." The Appellant acknowledged that he did not remember anything between 1:30 a.m. and 11:00 a.m. on June 23 and said that he had never experienced a blackout before that date. However, he also had never consumed that much alcohol. Defense counsel asked if Vandenburg was "in on the whole story that Banks told you," and the Appellant answered, "I don't remember. I don't know if he was in there or not, but pretty sure he probably was."

On cross-examination, the Appellant testified that he never watched the video of the victim that was on his cellular telephone and that he deleted it. He said that he met with Banks "for a long time" after this incident and that Banks was "going over step by step what we should say if we were questioned." The Appellant acknowledged that he did not tell Dean Black that he had been drinking alcohol and blacked out. He said he was scared to tell Dean Black the truth because a section of the campus was "dry" and because he did not want to lose his football scholarship.

Dr. Jonathan Lipman, a research associate professor in the Department of Psychiatry at East Tennessee State University, testified as an expert in neuropharmacology that pharmacology "deals with how drugs work" while neuropharmacology "deals with the effects of drugs on nerve, brain and behavior." Dr. Lipman said that he was provided with information about the Appellant and the amount of alcohol the Appellant consumed on June 22. Specifically, Dr. Lipman was provided with the following information:

> That [the Appellant] was nineteen years old, that he was 5'11", that at the
> time he weighed 205 to 210 pounds, and that on the night in question he

drank, beginning at 11:30, shots of Honey Jack, made by Jack Daniels, and continued for the next thirty-five minutes, he consumed eight to ten single shots of this product Honey Jack. And he arrived at a party around 12:15 [a.m.] and drank three to six single shots of vodka. Around 1:30 a.m., he drank three to six Lime-A-Ritas made by Bud Light. These are 12 ounce bottles. And his last drink was around [2:00] a.m.

Dr. Lipman testified that based on the information provided, he calculated the Appellant's likely blood alcohol concentration (BAC) at 2:30 a.m. and 3:10 a.m. He considered whether the Appellant was "not a very experienced drinker" versus an "experienced drinker" and used two different formulas: the "average all" formula and the Widmark formula. Using the average all formula and assuming the Appellant was not a very experienced drinker, his BAC would have been .23 to .4 grams percent at 2:30 a.m. and .226 to .41 grams percent at 3:10 a.m. Using the Widmark formula and assuming the Appellant was not a very experienced drinker, his BAC would have been .186 to .34 grams percent at 2:30 a.m. and .182 to .34 grams percent at 3:10 a.m. Using the average all formula and assuming the Appellant was an experienced drinker, his BAC would have been .216 to .398 grams percent at 2:30 a.m. and .205 to .395 grams percent at 3:10 a.m. Using the Widmark formula and assuming the Appellant was an experienced drinker, his BAC would have been .17 to .32 grams percent at 2:30 a.m. and .163 to .32 grams percent at 3:10 a.m. Dr. Lipman said that the "bottom line" of his calculations was that the Appellant's BAC was not less than .186 grams percent nor greater than .4 grams percent. Moreover, even at the lower level, the Appellant was "well drunk."

Dr. Lipman testified that lower levels of alcohol intoxication caused disinhibition and that higher levels caused people to behave improperly and "do things that are ill-advised." As the alcohol level further increased, it also could affect memory, causing a person to be "amnestic" the next day. Dr. Lipman explained that "it's just like a period of time that is missing, and that's where the word blackout comes from. But that's only a word that you would use the next day. Because at the time, you are not unconscious." Dr. Lipman acknowledged that the Appellant would have been able to find his way back to his room, make a telephone call, and take a shower even though he did not remember doing so. Dr. Lipman also acknowledged that the Appellant's ability to act intentionally and knowingly between 2:30 a.m. and 3:10 a.m. would have been "grossly impaired."

On cross-examination, Dr. Lipman testified that the information he used to make his calculations was provided to him by a psychologist and defense counsel. He acknowledged that if the information was incorrect, then his calculations also were incorrect.

David Whitfield testified that he was a teacher at Ensworth High School, a private school in Nashville. The Appellant was a student and football player at Ensworth and graduated in 2012. Whitfield taught and coached the Appellant about four years, and

they developed a "very fraternal" relationship. He described the Appellant as a "fine citizen," who "interacted peacefully with his peers." The Appellant was polite, and Whitfield never heard the Appellant speak disrespectfully to Whitfield's colleagues. The Appellant had only "minor infractions" at Ensworth, such as absenteeism and tardiness, and Whitfield never knew him to consume alcohol.

On cross-examination, Whitfield acknowledged that he knew very little about the facts of this case and that he had not been in the courtroom to hear or see the evidence. He also acknowledged that prior to June 23, 2013, the Appellant had to appear before Vanderbilt's Student Affairs Counsel because he failed a drug test. Additionally, the Appellant was accused of assaulting a fellow student and was involved in an incident in which he consumed alcohol and urinated on a car.

At the conclusion of the proof, the jury found the Appellant guilty of aggravated sexual battery as a lesser-included offense of aggravated rape in count one; guilty as charged of aggravated rape in count two; guilty of attempted aggravated rape as a lesser-included offense of aggravated rape in count three; guilty of attempted aggravated rape as a lesser-included offense of aggravated rape in count four; guilty of facilitation of aggravated rape as a lesser-included offense of aggravated rape in count five; guilty of aggravated sexual battery as charged in count six; and guilty of aggravated sexual battery as charged in count seven. After a sentencing hearing, the trial court ordered that the Appellant serve fifteen years at one hundred percent for the aggravated rape conviction, a Class A felony, and concurrent eight-year sentences for the remaining convictions, all Class B felonies, for a total effective sentence of fifteen years.

## II. Analysis

### A. Jury Instructions

The Appellant argues that his convictions should be reversed because the trial court erroneously instructed the jury on the mens rea for the offenses and erred by instructing the jury that voluntary intoxication was not a defense to aggravated rape. The State argues that the trial court did not err and that any error is harmless. We conclude that the Appellant is not entitled to relief.

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). Furthermore, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the

applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (citations omitted). "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." State v. Smith, 492 S.W.3d 224, (Tenn. 2016) (citing State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001)).

1. Aggravated Sexual Battery

First, the Appellant contends that his convictions of aggravated sexual battery in counts one, six, and seven should be reversed because the trial court improperly instructed the jury that "sexual contact" could be accomplished knowingly or recklessly. The State argues that the trial court properly instructed the jury. We agree with the State.

During the jury charge for aggravated rape in count one, the trial court instructed the jury on the lesser-included offense of aggravated sexual battery. Relevant to this case, aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant . . . [and] [t]he defendant is aided or abetted by one (1) or more other persons . . . and . . . [t]he defendant knows or has reason to know that the victim is . . . mentally incapacitated or physically helpless[.]" Tenn. Code Ann. § 39-13-504(a)(3)(B). Tennessee Code Annotated section 39-13-501(6) provides:

"Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Although the Appellant's retrial occurred in 2016, the trial court read the 2014 Pattern Jury Instruction for aggravated sexual battery to the jury.[2] See T.P.I.-Crim. 10.03 (2014). Specifically, the trial court instructed the jury as follows:

Aggravated Sexual Battery. Any person who commits the offense of Aggravated Sexual Battery is guilty of a crime. For you to find the defendant guilty of this offense, the state must have proven, beyond a reasonable doubt, the existence of the following essential elements: (1) the

---

[2] The Appellant contends that the trial court read the 2015 Pattern Jury Instruction for the offense. We have carefully compared the instruction given by the trial court to both the 2014 and 2015 Pattern Jury Instructions. The language used by the trial court was that of the 2014 Pattern Jury Instruction.

- 25 -

defendant had unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts or the clothing covering the immediate area of the alleged victim's intimate parts; and (2) that the defendant was aided or abetted by one or more persons; . . . and that the defendant knew or had reason to know that the alleged victim was mentally incapacitated or helpless; and (3) that the defendant acted either intentionally, knowingly or recklessly.

Sexual contact includes the intentional touching of the alleged victim's, the defendant's, or any other person's intimate parts or the intentional touching of the clothing covering the immediate area of the alleged victim's, the defendant's, or any other person's intimate parts if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

When instructing the jury on aggravated sexual battery in counts six and seven, the trial court referred the jury to the court's aggravated sexual battery instruction for count one.

On appeal, the Appellant takes issue with the instruction for the third element, that "the defendant acted either intentionally, knowingly or recklessly" because Tennessee Code Annotated section 39-13-501(6) requires that the sexual contact be intentional. In support of his argument, the Appellant relies on State v. Clark and State v. Troy Love.

In Clark, the jury convicted the defendant of aggravated sexual battery of a child less than thirteen. 452 S.W.3d 268, 297 (Tenn. 2014); see Tenn. Code Ann. § 39-13-504(a)(4). During the jury charge, the trial court instructed the jury as follows:

For you to find Fred Chad Clark, II guilty of aggravated sexual battery, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
(l) that he had unlawful sexual contact with the alleged victim ..., in which the defendant intentionally touched her intimate parts or the clothing covering the immediate area of her intimate parts; and
(2) that [the victim] was less than thirteen (13) years of age; and
(3) that he acted either intentionally, knowingly or recklessly.

Id. at 298. On appeal, the defendant claimed that the jury instructions were confusing because the first element required that he touched the victim intentionally whereas the third element provided that he acted intentionally, knowingly, or recklessly. See id.

Initially, our supreme court noted that the aggravated sexual battery statute did not provide for a specific mental state; therefore, the mental states of intentionally, knowingly, or recklessly, which were set out in the "generic mens rea statute of

- 26 -

Tennessee Code Annotated section 39-11-301(c)," could be applied to a "'circumstance[ ] surrounding the crime.'" Id. at 297 (quoting State v. Page, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). The court determined, though, that because the statutory definition of "sexual contact" in Tennessee Code Annotated section 39-13-501(6) specified that the unlawful sexual contact in element one had to be intentional, "the specific [mens rea] trumps the general [mens rea] in regard to the first element of aggravated sexual battery." Id. at 298. Accordingly, the court considered whether the trial court's instructions adequately informed the jury that in order to convict the defendant, the jury must find that he intentionally touched the victim's intimate parts or the clothing covering the immediate area of her intimate parts. Id. The court agreed with the defendant that "the way this instruction was structured created a potential for juror confusion concerning the applicable mental states." Id. However, the court then stated as follows:

> Determining whether this instruction is erroneous is a close call. Despite the ambiguity, a jury which read these instructions carefully would likely determine that the "sexual contact" element had to be done "intentionally," regardless of the potentially confusing placement of element (3) of the trial court's jury instructions. Because the words "intentionally touched" occur in close proximity to "unlawful sexual contact" in element (1), a reasonable jury would probably interpret this to mean that the more specific mens rea of "intentionally" had to apply to the touching/sexual contact, while the broader mental states contained in element (3) applied to all other aspects of the crime.

Id.

Furthermore, our supreme court refused to hold that the instruction was erroneous because it determined that any error would have been harmless in light of the State's theory that all of the defendant's conduct was intentional, which gave the jury "no occasion to consider these lesser mental states in regard to the actus reus of aggravated sexual battery." See id. at 299. Nevertheless, the court encouraged the Committee on Pattern Jury Instructions to clarify the mens rea for each element of the crime. Id. In response to Clark, the Committee modified the relevant pattern instruction in 2015 to read as follows:

> Any person who commits the offense of aggravated sexual battery is guilty of a crime.

> For you to find the defendant guilty of this offense, the state must have proven, beyond a reasonable doubt, the existence of the following essential elements:

(1)  the defendant had <u>intentional</u> unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts, or the clothing covering the immediate area of the alleged victim's intimate parts; and

(2)  that the defendant was aided or abetted by one (1) or more persons and knew, or had reason to know, that the alleged victim was mentally defective, mentally incapacitated or physically helpless[.]

Sexual contact <u>means</u> the intentional touching of the alleged victim's, the defendant's, or any other person's intimate parts or the intentional touching of the clothing covering the immediate area of the alleged victim's, the defendant's, or any other person's intimate parts if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

<u>See</u> T.P.I.-Crim. 10.03 & n.6 (2015) (footnote citing <u>Clark</u>) (emphasis added).  The modified pattern instruction eliminated the third element, that the defendant acted intentionally, knowingly, or recklessly.  <u>See</u> <u>id.</u>

In <u>Troy Love</u>, another case in which the defendant was convicted of aggravated sexual battery of a child less than thirteen, the trial court gave an aggravated sexual battery instruction that was "virtually identical" to the instruction given in <u>Clark</u>.  No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *20 (Tenn. Crim. App. at Knoxville, Mar. 21, 2017).  However, the proof in <u>Troy Love</u> included a pretrial statement by the defendant in which he said that he "'didn't mean to do it.'"  <u>Id.</u> at *21.  Thus, unlike our supreme court in <u>Clark</u>, a panel of this court in <u>Troy Love</u> held that it could not "avoid the question of whether the jury instruction was erroneous by concluding that any error would be harmless beyond a reasonable doubt."  <u>Id.</u>  The panel went on to conclude that the instruction was erroneous under the facts of that case, stating, "Here, . . . the imprecision of the instruction coupled with the Defendant's statements created the possibility that the jury found the Defendant guilty of aggravated sexual battery without having determined that his sexual contact with the victim was intentional."  <u>Id.</u> at *22.  Moreover, the panel concluded that the error was not harmless.  <u>Id.</u>

The State argues that the Appellant is not entitled to relief in the present case because the trial court included an instruction making it clear that "sexual contact" requires an "intentional touching."  We agree with the State.  After the trial court instructed the jury on the three elements of aggravated sexual battery, the trial court immediately instructed the jury on the definition of "sexual contact."  That definition stated three times that the touching must have been intentional, meaning that the trial

court told the jury a total of four times, in close proximity, that the "sexual contact" element had to be accomplished intentionally. Therefore, we fail to see how the jury in this case could have been confused about the mens rea for element one or could have thought that the mens rea for the element was knowingly or recklessly. We reiterate that our supreme court did not hold in Clark that the given instruction was erroneous. Therefore, while the trial court should have given the modified pattern instruction, we conclude that the Appellant is not entitled to relief.

2. Aggravated Rape

Next, the Appellant contends that his convictions of aggravated rape in count two, attempted aggravated rape in counts three and four, and facilitation of aggravated rape in count five should be reversed because the trial court instructed the jury that it could convict him of aggravated rape upon a finding of "reckless" sexual penetration and "reckless" awareness of the victim's mental incapacitation. The State argues that the trial court properly instructed the jury that the mens rea for aggravated rape was "intentionally, knowingly, or recklessly." We agree with the State.

The Appellant was charged with aggravated rape in counts one through five. Aggravated rape is defined, in pertinent part, as "unlawful sexual penetration of a victim by the defendant or the defendant by a victim . . . [and] [t]he defendant is aided or abetted by one (1) or more other persons . . . and . . . [t]he defendant knows or has reason to know that the victim is . . . mentally incapacitated or physically helpless[.]" Tenn. Code Ann. § 39-13-502(a)(3)(B). Tennessee Code Annotated § 39-13-501(7) provides:

> "Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]

During the charge for aggravated rape, the trial court stated as follows:

> Counts 1 through 5 - Aggravated Rape. Any person who commits the offense of Aggravated Rape is guilty of a crime. For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements: (1) that the defendant had unlawful sexual penetration of the alleged victim, or the alleged victim had unlawful sexual penetration of the defendant; and (2) that the defendant was aided or abetted by one or more persons, and that the defendant knew or had reason to know that the alleged victim was mentally incapacitated or physically helpless; and (3) that the defendant acted either intentionally, knowingly or recklessly.

- 29 -

See T.P.I.-Crim. 10.01.

Like the previous issue, the Appellant contends that the trial court's instruction on the third element, that "the defendant acted either intentionally, knowingly, or recklessly," was erroneous. He claims that the "sexual penetration" in element one must have been intentional or knowing and that the awareness of the victim's mental incapacitation or physical helplessness in element two must have been knowing; therefore, the trial court erred by including reckless as a mens rea in the third element.

Initially, we note that the offense of aggravated rape does not specify a requisite mental state. Thus, the mental states of intentionally, knowingly, or recklessly apply to the circumstances surrounding the crime. Tenn. Code Ann. § 39-11-301(c); Clark, 452 S.W.3d at 297. In support of his claim that that the "sexual penetration" must have been intentional or knowing, the Appellant relies on State v. Weltha Womack, No. E2003-02332-CCA-R3-CD, 2005 WL 17428, at *8-9 (Tenn. Crim. App. at Knoxville, Jan. 4, 2005), in which a panel of this court held that the reckless mens rea could not apply to sexual penetration under the aggravated rape statute. However, in Clark, our supreme court expressly overruled that holding, concluding that reckless was a sufficient mens rea for the element of sexual penetration. Clark, 452 S.W.3d at 296 & n.14; see Maurice Johnson v. State, No. W2014-01982-CCA-R3-PC, 2015 WL 5005765, at *4 (Tenn. Crim. App. at Jackson, Aug. 21, 2015) (citing Weltha Womack as having been "overruled by" Clark).

The Appellant also relies on State v. Dewayne D. Fleming, No. M2015-01774-CCA-R3-CD, 2017 WL 2257705 (Tenn. Crim. App. at Nashville, May 23, 2017), in which the defendant argued that the jury charge lowered the State's burden of proof by allowing the jury to convict him upon a finding of mere "reckless" sexual penetration. No. M2015-01774-CCA-R3-CD, 2017 WL 2257705, at *7. In considering that issue, this court recognized that in State v. Anthony J. Fulmer, No. M2008-01206-CCA-R3-CD, 2010 WL 681395, at *4 (Tenn. Crim. App. at Nashville, Feb. 26, 2010), "[a] panel of this court . . . held that when the charged offense is aggravated rape, which involves a nature of conduct crime, it is error for the trial court 'to charge the mental state definition of "reckless" with respect to the element of sexual penetration.'" Id. at *8. However, Anthony J. Fulmer was filed four years before Clark. Moreover, this court did not even mention Clark in Dewayne D. Fleming. In sum, our supreme court determined in Clark that reckless was a sufficient mens rea for the element of sexual penetration. Therefore, the trial court properly instructed the jury on the mens rea for aggravated rape in this case.

We now turn to the Appellant's claim that a defendant's awareness that the victim was mentally incapacitated or physically helpless must have been knowing. The statute provides that "the defendant knew or had reason to know" that the victim was mentally

incapacitated or physically helpless. Tenn. Code Ann. § 39-13-502(a)(3)(B). The State argues that the reckless mens rea applies to such language. We agree. "'Reckless' refers to a person who acts recklessly with respect to <u>circumstances surrounding the conduct</u> or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-302(c) (emphasis added). The element regarding the victim's being mentally incapacitated or physically helpless is a circumstance surrounding the conduct. <u>See</u> <u>State v. Deji A. Ogundiya</u>, No. M2002-03099-CCA-R3-CD, 2004 WL 315138, at *6 (Tenn. Crim. App. at Nashville, Feb. 19, 2004) (stating that for sexual battery pursuant to Tennessee Code Annotated section 39-13-505(a)(2) in which victim did not consent "and the defendant knows or has reason to know at the time of the contact that the victim did not consent," trial court properly instructed jury as to mens rea of recklessness). Moreover, this court has held that the reckless mens rea suffices for aggravated rape. <u>State v. Hood</u>, 221 S.W.3d 531, 546 (Tenn. Crim. App. 2006); <u>see</u> <u>Maurice Johnson</u>, No. W2014-01982-CCA-R3-PC, 2015 WL 5005765, at *6 (stating that "opinions of this court seem to be in unison on instructing the jury on intentional, knowing, and reckless for rape"). Accordingly, the trial court properly instructed the jury.

3. Voluntary Intoxication

Finally, the Appellant contends that he is entitled to a new trial in counts two through five because the trial court erred by instructing the jury that voluntary intoxication was not a defense to aggravated rape. The State argues that the trial court properly instructed the jury on voluntary intoxication. We agree with the State.

The trial court instructed the jury on voluntary intoxication as follows:

> Intoxication. Included in the defendant's pleas of not guilty is his plea of intoxication as a defense. . . .
>
> . . . .
>
> If you find that the defendant was intoxicated to the extent that he could not have possessed the required culpable mental state, then he cannot be guilty of the offense charged. If you are not satisfied beyond a reasonable doubt that a defendant possessed a culpable mental state, then you must find him not guilty.
>
> Where recklessness establishes an element of the offense, such as aggravated rape, and a principal offender is unaware of the risks because of voluntary intoxication, the principal offender's unawareness is immaterial

and is no defense for the offense of aggravated rape or any other offense where recklessness is sufficient to establish the offense.

See T.P.I.-Crim. 40.02.

Tennessee Code Annotated section 39-11-503(a) provides that voluntary "intoxication itself is not a defense to prosecution for an offense" but that "intoxication . . . is admissible in evidence, if it is relevant to negate a culpable mental state." "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." State v. Hatcher, 310 S.W.3d 788, 814 (Tenn. 2010). Our supreme court has explained that

> "[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity."

Id. at 815 (quoting Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979) (footnote omitted). In other words, "[v]oluntary intoxication is not a defense to a criminal offense unless the intoxication negates the specific intent required by the crime." State v. Demarco Cortez Taylor, No. M2016-01436-CCA-R3-CD, 2017 WL 2829899, at *9 (Tenn. Crim. App. June 30, 2017) (citing Harrell, 593 S.W.2d at 664).

For the reasons discussed in the previous section, proof of specific intent is not required to establish the crime of aggravated rape. Therefore, we agree with the State that the trial court properly instructed the jury on voluntary intoxication.

B. Superseding Indictment

The Appellant asserts that the trial court erred by denying his motion to dismiss the superseding indictment because it was barred by the Double Jeopardy Clause. Specifically, he contends that the superseding indictment violates double jeopardy principles because the State added an essential element of the offense for the counts of aggravated rape and aggravated sexual battery and because "[t]he State was not entitled to a second chance with the return of a superseding indictment where jeopardy had attached to the first indictment." The State argues the trial court properly denied the motion to dismiss. We agree with the State.

In August 2013, the grand jury indicted the defendants in case number 2013-C-2199 for five counts of aggravated rape and two counts of aggravated sexual battery. The

aggravated rape counts alleged that each defendant unlawfully sexually penetrated the victim and was aided and abetted by one or more persons pursuant to Tennessee Code Annotated section 39-13-502. The aggravated sexual battery counts alleged that each defendant had unlawful sexual contact with the victim and was aided and abetted by more than one person pursuant to Tennessee Code Annotated section 39-13-504. In January 2015, the Appellant and Vandenburg were tried jointly. According to the Appellant's brief, after the jury was sworn, defense counsel for Vandenburg challenged the indictment, claiming that it failed to allege the essential element that "the defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless." Trial counsel for the Appellant adopted Vandenburg's motion to dismiss, and the trial court denied the motion after a hearing.

On January 27, 2015, the Appellant's and Vandenburg's joint trial resulted in the jury's convicting them as charged except that the jury found them guilty of attempted aggravated rape as a lesser-included offense of aggravated rape in count four. Before sentencing, Vandenburg and the Appellant filed a motion to declare a mistrial or, in the alternative, set aside the verdicts due to a juror's failure to disclose material information during voir dire. The trial court granted the motion and vacated the convictions.

In July 2015, the State filed a superseding indictment with case number 2015-C-1517, again charging each of the four defendants with aggravated rape in counts one through five and aggravated sexual battery in counts six and seven. For all of the counts, though, the State added language that the defendant "knew or had reason to know that [the victim] was mentally incapacitated or physically helpless," which was missing from all seven counts in the previous indictment. Vandenburg filed a motion to dismiss the superseding indictment, claiming that "the inclusion of this additional element charges additional or different offenses than were contained in the original indictment."[3] Vandenburg also claimed that the superseding indictment violated double jeopardy principles because jeopardy attached to the first indictment when the jury was sworn for the first trial and was not terminated by the trial court's declaration of a mistrial.

The trial court held a hearing on the motion in October 2015. During the hearing, the State argued that the trial court's declaring a mistrial as to all counts "restored" the defendants to the same position they were in before the jury was sworn, which permitted the superseding indictment. In a written order, the trial court held that "[t]he new trial granted by way of a mistrial has returned the defendant[s] to the same position [they were] in prior to the first trial. Thus, the superseding indictment does not implicate any procedural or constitutional concerns." The trial court denied the motion to dismiss the superseding indictment.

---

[3] The Appellant filed a motion notifying the trial court that he "adopts and joins" Vandenburg's motion to dismiss.

Ordinarily, "[t]he decision whether to dismiss an indictment lies within the discretion of the trial court." State v. Harris, 33 S.W.3d 767, 769 (Tenn. 2000). However, because the trial court considered whether the superseding indictment violated double jeopardy, which is a constitutional issue, we think the more appropriate standard of review is de novo with no presumption of correctness. See State v. Merriman, 410 S.W.3d 779, 791 (Tenn. 2013) (citing Ornelas v. United States, 517 U.S. 690, 697-99 (1996), and concluding that the appropriate standard of review for a constitutional issue is de novo). The trial court's findings of fact, though, are entitled to substantial deference on appeal unless the evidence preponderates against them. Id. at 794.

Under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Similarly, article I, section 10 of the Tennessee Constitution states that "no person shall, for the same offence, be twice put in jeopardy of life or limb." The Double Jeopardy Clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). "Once jeopardy attaches, a defendant has a valued interest in having the particular jury selected for trial render a verdict." State v. Huskey, 66 S.W.3d 905, 914 (Tenn. Crim. App. 2001) (citing United States v. Jorn, 400 U.S. 470, 485-86 (1971)). However, "'a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.'" Id. (quoting Wade v. Hunter, 336 U.S. 684, 688-89 (1949)).

Regarding superseding indictments, our supreme court has explained:

The power to seek a superseding indictment lies within this broad discretion of the State. A superseding indictment is an indictment obtained without the dismissal of a prior indictment. . . . Where there has been no jeopardy on the first indictment, a grand jury may return a new indictment against an accused even though another indictment is pending. . . . Although the State may not bring a superseding indictment to harass or intimidate the accused, a legitimate decision to bring a superseding indictment is uniquely within the State's authority. Thus, the State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial.

Harris, 33 S.W.3d at 771 (emphasis added) (citations omitted).

First, we will address the Appellant's claim regarding the language added to the superseding indictment. The Appellant contends that the superseding indictment violates

double jeopardy principles because "[t]he prosecution does not have the opportunity to try a defendant again under a revamped superseding indictment to get better facts or facts supporting a new element of an offense before the jury, or where its failure was a result of poor preparation." Granted, the superseding indictment in this case added language from the aggravated rape and aggravated sexual battery statutes that was missing from the first indictment. However, the additional language did not materially or substantially alter the superseding indictment or the charges against the Appellant. See State v. Bud Cash, Jr., No. E2004-02647-CCA-R3-CD, 2005 WL 1183145, at *7 (Tenn. Crim. App. at Knoxville, May 18, 2005). The prosecutors did not acquire any new evidence at the first trial that necessitated the additional language in the superseding indictment, the Appellant was charged with the exact same crimes in both indictments, and the State proceeded under the same theories at both trials. Moreover, the Appellant challenged the State's failure to include the missing element from the first indictment during his first trial. Therefore, he was well-aware of the theories of aggravated rape and aggravated sexual battery the State would be proceeding on at both trials. Thus, we conclude that the superseding indictment was not improper with regard to the additional language.

Next, we will address the Appellant's claim that the superseding indictment violated double jeopardy principles because the State returned the indictment after jeopardy had attached to the first indictment. As noted by the Appellant, jeopardy attaches in a jury trial when the jury is impaneled and sworn. State v. Knight, 616 S.W.2d 593, 595 (Tenn. 1981). Moreover, jeopardy continues "'where criminal proceedings against an accused have not run their full course.'" Justices of Boton Mun. Ct. v. Lydon, 466 U.S. 294, 308 (1984) (quoting Price v. Georgia, 398 U.S. 323, 326-29 (1970)). In order for the Double Jeopardy Clause to apply, an event must occur that extinguishes the original jeopardy. Richardson v. United States, 468 U.S. 317, 325 (1984). The declaration of a mistrial after a jury fails to reach a verdict is not one of those events. Id. Furthermore, under the concept of "continuing jeopardy," double jeopardy does not bar a retrial when a defendant obtains a new trial through a successful appeal on some basis other than sufficiency of the evidence. See State v. Harris, 919 S.W.2d 323, 327 (Tenn. 1996).

The issue raised by the Appellant is not whether the State could retry him after the trial court declared a mistrial but whether the State could retry him on the superseding indictment when jeopardy had attached to the original indictment. The State cites to several Tennessee cases in which this court has upheld retrials on indictments that were filed after the trial court declared a mistrial. As noted by the State, though, none of those cases is on point. In all of them, the trial court declared a mistrial in the first trial before the jury reached a verdict, and the primary issue was whether the State could add charges in a second indictment, which was filed after the mistrial, that were not included in the original indictment. See State v. David Neal Davis, No. M2009-00691-CCA-R3-CD, 2011 WL 1631828, at *6-10 (Tenn. Crim. App. at Nashville, Apr. 19, 2011) (finding no double jeopardy violation because no evidence the State goaded defendant into

requesting mistrial after victim's testimony and finding no prosecutorial vindictiveness when State charged defendant in superseding indictment with additional offenses); State v. Michael Hilliard, No. W2008-02813-CCA-R3-CD, 2010 WL 4324346, at *8-12 (Tenn. Crim. App. at Jackson, Nov. 1, 2010) (finding that Tennessee Rule of Criminal Procedure Rule 8(a), regarding mandatory joinder of offenses, did not bar State from retrying defendant on first indictment with second indictment, which State filed after first trial ended in hung jury and added additional charge); State v. Frank Michael Vukelich, No. M1999-00618-CCA-R3-CD, 2001 WL 1044617, at *7-11 (Tenn. Crim. App. at Nashville, Sept. 11, 2001) (finding that trial court did not err by allowing State to add counts to superseding indictment filed after first trial resulted in hung jury).

However, the State also cites United States v. Corona, 804 F.2d 1568 (11th Cir. 1986). In Corona, the defendants argued that double jeopardy prevented the return of a superseding indictment following a hung jury. Corona, 804 F.2d at 1570. In support of their argument, the defendants relied on the concept of continuing jeopardy and the principle that a superseding indictment could not be brought after a trial had begun. Id. In rejecting the defendants' argument, the Eleventh Circuit explained as follows:

> Defendants' argument lacks force when we consider the rationale behind disallowing superseding indictments during a trial on the merits. The implicit rationale behind such holdings is that a defendant should have advance notice of the charges against him. See, e.g., United States v. Edwards, 777 F.2d 644, 649 (11th Cir. 1985) (additional charges in superseding indictment put defendants on notice, in a timely manner, of those charges against which they had to defend), cert. denied, 475 U.S. 1123 (1986); United States v. Wilks, 629 F.2d 669, 672 (10th Cir. 1980) (holding that superseding indictment before trial was not prejudicial to defendant since it presented no factual questions that should not have been answered by defendant's investigation of original indictment). Changes in the substance of the indictment, therefore, should not be foisted upon a defendant after trial begins. However, this rationale does not apply in the current context. After a mistrial because the jury hung or for any other such reason, the defendant would have ample time to prepare for his defense under a superseding indictment. Therefore, even though jeopardy has attached to the defendant, the practical effect of a superseding indictment after a hung jury is no different from one returned with ample time before a trial on the merits.

Id. Relying on Corona, other courts also have concluded that double jeopardy does not prevent retrying a defendant on a superseding indictment after a trial has ended in a mistrial. See United States v. Flores-Perez, 646 F.3d 667, 671 (9th Cir. 2011); Stovall v. State, 800 A.2d 31, 40-41 (Md. 2002).

Turning to the instant case, we also agree with the Eleventh Circuit's rationale in Corona. Here, the State filed a superseding indictment charging the Appellant with the same offenses as charged in the original indictment. The State did not file the superseding indictment to harass or intimidate the Appellant, which was the concern in Harris. Furthermore, the Appellant had plenty of advance notice of the charges against him and, as discussed above, the additional language in the superseding indictment did not change the substance of the original indictment, which were the concerns in Corona.

Additionally, the present case is unusual in that the trial court granted the Appellant's motion for a mistrial after the jury convicted the Appellant. "A motion for the entry of a mistrial is a procedural device which requests the trial court to stop the trial, discharge the jury, and impanel another jury to determine the guilt of the accused." State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). However, "a motion for new trial is made after a judgment has been rendered." State v. Terry Sanders, No. M2011-00426-CCA-R3-CD, 2012 WL 5948885, at *4 (Tenn. Crim. App. at Nashville, Nov. 15, 2012) (quoting Howell v. Davis, 299 S.E.2d 336, 337 (S.C. 1983)). Therefore, in our view, the granting of a mistrial after the jury's verdict is functionally equivalent to an order granting a motion for new trial. See State v. Garza, 774 S.W.2d 724, 726 (Tex. App. 1989). Moreover, the trial court stated in its order granting the Appellant's motion that "a new trial is necessary and appropriate in order to promote a fair determination of the defendants' guilt or innocence." Thus, double jeopardy did not bar the Appellant's retrial because he obtained a new trial through a successful appeal on some basis other than sufficiency of the evidence.

Accordingly, we agree with the State that the superseding indictment in this case did not violate double jeopardy with regard to counts one through three and counts five through seven. Although not raised by the Appellant, the jury in his first trial acquitted him of aggravated rape involving penile penetration of the victim's vagina in count four and convicted him of the lesser-included offense of attempted aggravated rape. Therefore, double jeopardy barred the State from reindicting and retrying him for aggravated rape in the second trial, and the greatest conviction the State could seek in a retrial on count four was attempted aggravated rape. Given that the second jury also acquitted the Appellant of aggravated rape involving penile penetration of the victim's vagina and convicted him of the lesser-included offense of attempted aggravated rape, we conclude that the error in retrying the Appellant for aggravated rape in count four does not rise to the level of plain error and that a new trial for the offense of attempted aggravated rape is unnecessary. See Tenn. R. App. P. 36(b).

We note that the Appellant also appears to claim that the superseding indictment violated Tennessee Rule of Criminal Procedure 7(b), which provides that "[an] indictment . . . may be amended in all cases with the consent of the defendant. If no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced, the court may permit an amendment without the

defendant's consent before jeopardy attaches." In this case, though, there was no amendment of the indictment. Instead, the State obtained a superseding indictment from the grand jury. Therefore, the Appellant's retrial on the superseding indictment did not violate Rule 7(b). See State v. David Johnson, No. W1998-00687-CCA-R3-CD, 2001 WL 278093, at *13 (Tenn. Crim. App. at Jackson, Mar. 14, 2001).

## C. Vandenburg's Statements

The Appellant claims that the trial court erred by admitting statements and conduct by Vandenburg. He contends that the evidence was inadmissible hearsay, irrelevant to his guilt, and unnecessarily and unfairly prejudicial. The State argues that the evidence was admissible and, in any event, harmless. We conclude that the evidence was admissible.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. Tennessee Rule of Evidence 803(1.2)(E) provides that a hearsay statement is allowed against a party when made "by a co-conspirator of a party during the course of and in furtherance of the conspiracy."

In order to be admissible under this exception, the State must show that (1) there is evidence of the existence of the conspiracy and the connection of the declarant and the defendant to it; (2) the declaration was made during the pendency of the conspiracy; and (3) the declaration was made in furtherance of the conspiracy. State v. Henry, 33 S.W.3d 797, 801-02 (Tenn. 2000). A "statement may be in furtherance of the conspiracy in countless ways. Examples include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project." State v. Carruthers, 35 S.W.3d 516, 556 (Tenn. 2000) (citation omitted). If a conspiracy is shown to exist, the co-conspirator's statement is admissible even though no conspiracy has been formally charged. State v. Lequire, 634 S.W.2d 608, 612 n.1 (Tenn. Crim. App. 1981).

The standard of proof required to show the existence of the prerequisite conspiracy is proof by a preponderance of the evidence. Henry, 33 S.W.3d at 802. The State only has to show an implied understanding between the parties, not formal words or a written agreement, in order to prove a conspiracy. State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprises." Id. (citation omitted). A trial court's factual findings and credibility determinations regarding hearsay are binding upon this court unless the evidence preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). However, the

determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that we review de novo. Id.

First, the Appellant claims that the trial court never determined whether he and Vandenburg were involved in a conspiracy that warranted application of the exception to the hearsay rule. We disagree.

During Dean Black's cross-examination, defense counsel questioned him about the Appellant's statement to Student Conduct. Defense counsel then advised the trial court that counsel wanted to question Dean Black about statements made by some of the Appellant's codefendants, although counsel did not say which codefendants. The State objected on hearsay grounds, and defense counsel argued that the statements were admissible under the co-conspirator exception to the hearsay rule. The trial court asked to read the statements and stated as follows: "In reading these statements, it appears that they evolved, denied that anything happened; so that speaks to a conspiracy."

During Detective Gish's direct examination, he testified that while searching Joseph Quinzio's home, he found a receipt for a new cellular telephone that was purchased on July 7 or July 8, 2013. When the State attempted to show him the receipt, defense counsel objected and argued that the evidence was irrelevant because there was no evidence of a relationship between Quinzio and the Appellant. In a jury-out conference, the State advised the trial court that Quinzio's new telephone had to be purchased because Vandenburg destroyed Quinzio's old telephone and that the evidence was admissible because "[i]t's the action of a coconspirator destroying evidence. It's part of the cover-up we've been talking about. . . . There was a conspiracy to rape her and there was a conspiracy to cover it up; and, Mr. Batey is a part of both of those." The trial court responded, "I am going to go ahead and allow this testimony. We can get through it and move on."

Shortly thereafter, the State asked Detective Gish if he was able to analyze Quinzo's telephone. Detective Gish said yes but that Quinzio "had told me that there wasn't a lot of information on this phone, because Brandon Vandenburg had purchased this phone for him on the 8th of --." At that point, defense counsel interrupted and objected to Detective Gish's testimony as hearsay. The State responded, "Your Honor, the State's position is that it's a statement of the coconspirator in furtherance of the conspiracy to cover up the original crime." The trial court agreed with the State saying, "Which it is. So go ahead."

The trial court's statements demonstrate that it found that an ongoing conspiracy existed between the defendants. We agree with the trial court. The defendants carried the victim into room 213, and Vandenburg announced that they were going to "[f*ck] this [b*tch]." Vandenburg passed out condoms to his codefendants, and the defendants sexually abused the victim for thirty minutes. Almost immediately afterward, the

defendants realized the severity of the situation. Vandenburg, McKenzie, and Banks went into the bathroom; McKenzie and Banks were "freaking out" about what had occurred in room 213; and Vandenburg flushed the condoms down the toilet. The three of them then returned to Vandenburg's room, and Vandenburg tried to get Banks and McKenzie to take the victim back to her car. Vandenburg put a towel over a surveillance camera so that Banks and McKenzie would not be seen by the camera; however, Banks and McKenzie ran out of room 213 and returned to their room.

On June 24, the Appellant told Boyd in a text message that he was "stressing" and told Boyd to tell Van Der Wal not to say anything. According to the Appellant's own testimony, he and his codefendants met in McKenzie and Banks's room on June 24 and talked about what they should say happened to the victim. When the defendants talked with Student Conduct on June 25, they denied having sexual contact with the victim. After talking with Student Conduct, the defendants met again at a Popeye's restaurant and agreed "to stick with that [story] until further notice." The defendants continued to lie, telling the police that they did not do anything to the victim. Both the Appellant and Vandenburg acted in furtherance of their conspiracy to cover up the crimes by destroying evidence. Specifically, both of them deleted photographs and videos from their cellular telephones, and Vandenburg destroyed Quinzio's telephone and tried to "wipe" Quinzio's computer of any evidence. Therefore, Vandenburg's statements were admissible under the hearsay exception.

The Appellant argues that even if the State proved a conspiracy, the trial court erred by admitting certain inflammatory statements made by Vandenburg that were not made in furtherance of the conspiracy. In particular, the Appellant takes issue with the trial court's allowing McKenzie to testify that Vandenburg said he had done this before and that Vandenburg said his dad "beat" a rape case. The Appellant objected to those statements at trial, arguing that they were highly prejudicial. The trial court ruled that the statements were prejudicial but not highly prejudicial to the Appellant and were admissible. We agree with the trial court. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. While prejudicial, Vandenburg's statements were more prejudicial to Vandenburg than to the Appellant. Moreover, the statements were highly probative to the defendants' conspiracy in this case. Therefore, we cannot say that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

Finally, the Appellant contends that the trial court erred by allowing irrelevant testimony about Vandenburg's searches on his telephone and laptop during the crimes

because the evidence was irrelevant to the Appellant's participation or concealment of the offenses. However, as noted by the State, the Appellant did not object to the evidence at trial. Therefore, the issue has been waived. See Tenn. R. App. P. 36(a).

## D. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support the convictions because the State did not offer any proof that he was aware of his actions or was aware of the victim's mental incapacitation or physical helplessness. Regarding his conviction of facilitation of aggravated rape, he claims that the evidence is insufficient to show that the bottle penetrated the victim's anus because Detective Gish testified that the bottle "appeared to be" in her anus. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury convicted the Appellant of aggravated sexual battery in count one, which related to the State's theory that he digitally penetrated the victim's vagina; aggravated

- 41 -

rape in count two, which related to the State's theory that he digitally penetrated the victim's anus; attempted aggravated rape in count three, which related to the State's theory that he put his penis into the victim's mouth; attempted aggravated rape in count four, which related to the State's theory that he penetrated her vagina with his penis; facilitation of aggravated rape in count five, which related to the State's theory that Banks penetrated the victim's anus with a water bottle; aggravated sexual battery in count six, which related to the State's theory that Banks touched the victim's genital area; and aggravated sexual battery in count seven, which related to the State's theory that the Appellant placed his buttocks on the victim's face.

As stated previously, aggravated rape as instructed to the jury in this case is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim . . . [and] [t]he defendant is aided or abetted by one (1) or more other persons . . . and . . . [t]he defendant knows or has reason to know that the victim is . . . mentally incapacitated or physically helpless[.]" Tenn. Code Ann. § 39-13-502(a)(3)(B). Our Code provides the following definitions:

> (4) "Mentally incapacitated" means that a person is rendered temporarily incapable of appraising or controlling the person's conduct due to the influence of a narcotic, anesthetic or other substance administered to that person without that person's consent, or due to any other act committed upon that person without that person's consent;

> (5) "Physically helpless" means that a person is unconscious, asleep or for any other reason physically or verbally unable to communicate unwillingness to do an act; [and]

> . . . .

> (7) "Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]

Tennessee Code Annotated § 39-13-501(4), (5), (7). The trial court instructed the jury that "[a]n aider and abettor is one who advises, counsels, procures or encourages another to commit a crime."

Aggravated sexual battery is defined, in pertinent part, as "unlawful sexual contact with a victim by the defendant . . . [and] [t]he defendant is aided or abetted by one (1) or more other persons . . . and . . . [t]he defendant knows or has reason to know that the

victim is . . . mentally incapacitated or physically helpless[.]" Tenn. Code Ann. § 39-13-504(a)(3)(B).  Tennessee Code Annotated section 39-13-501(6) provides:

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Criminal attempt occurs when a person, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

The trial court instructed the jury on criminal responsibility.  "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both."  Tenn. Code Ann. § 39-11-401(a).  Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . the person solicits, directs, aids, or attempts to aid another person to commit the offense."  Tenn. Code Ann. § 39-11-402(2).  A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.  Tenn. Code Ann. § 39-11-403(a).

Taken in the light most favorable to the State, the evidence shows that Vandenburg drove the victim's Mercedes to Gillette Hall, parked in front of the entrance,

and asked his three codefendants to help him get the victim to his room. The four defendants took the victim into room 213 and were in the room with her for about thirty minutes. During that time, they performed various sexual acts on her and took photographs and videos of her. Detective Gish testified that one of the thumbnail images from Vandenburg's telephone appeared to show the Appellant inserting his finger into one of the victim's "orifices." The State asserted in closing arguments that the image showed the Appellant digitally penetrating the victim's vagina. The State showed the image to the jury during Detective Gish's testimony and again during closing arguments. The jury rejected the State's argument that the Appellant digitally penetrated the victim's vagina but nevertheless concluded that he had sexual contact her. The evidence supports his conviction of aggravated sexual battery in count one.

A video recorded in the room showed the Appellant's finger in the victim's anus, which supports his conviction of aggravated rape in count two, and McKenzie testified that he saw the Appellant trying to put the Appellant's penis into the victim's mouth, which supports the Appellant's conviction of attempted aggravated rape in count three. Another video showed the Appellant's penis area "mounted up" to the victim's vagina, and McKenzie testified that he saw the Appellant trying to penetrate the victim's vagina with his penis, which supports the conviction of attempted aggravated rape in count four. Although Detective Gish testified that a third video "appear[ed]" to show a bottle inserted in the victim's anus, the jury viewed the video and obviously concluded that the bottle was in the victim's anus. Someone in the room said, "'Squeeze that shit, squeeze that shit,'" and Banks twisted and squeezed the bottle. Thus, the evidence supports the Appellant's conviction of facilitation of aggravated rape in count five. Other images showed Banks pulling open the victim's vagina with his left hand so that he could photograph her with his right hand and showed the Appellant with his anal area on the victim's face, which supports the Appellant's convictions of aggravated sexual battery in counts six and seven.

Moreover, while the Appellant testified that he consumed about six alcoholic drinks containing Honey Jack, at least four alcoholic drinks containing vodka, and four Lime-A-Ritas prior to the crimes, McKenzie testified that he and the Appellant consumed only two or three Lime-A-Ritas and one or two cups of vodka. McKenzie also testified that although they were "buzzed" when they left East Hall and returned to Gillette Hall, they were able to function on their own and did not have any trouble walking or understanding each other. The Appellant was even able to text a food order to McKenzie. Quela Royster, who accompanied the Appellant back to Gillette Hall, testified that he was intoxicated but acknowledged telling the district attorney's office that he was not "falling down drunk." After the crimes, the Appellant ate the food he had ordered and went into McKenzie's room. McKenzie testified that the Appellant was using the Appellant's telephone and was talking normally. The Appellant also was able to telephone Sara Enoch and ask her to come to Gillette Hall. Enoch stayed with the

Appellant in his room and testified that he sounded drunk and was acting unusually nice but that she did not notice anything else unusual about him.

Although the Appellant testified that he did not remember anything that happened in room 213, McKenzie testified that he asked the Appellant later that morning if the Appellant "got it in" and that the Appellant's answered yes. In the days after the crimes, the Appellant talked with friends via text messages. He also spoke with school officials and the police. He never told anyone that he did not remember what happened in Vandenburg's room. Instead, he told them that he helped get the victim into the room and that nothing happened to the victim.

Additionally, the jury was able to observe the Appellant and the victim before, during, and after the crimes. Surveillance video recorded in Gillette Hall showed the Appellant laughing and, as Lieutenant Harville described, horseplaying outside the first-floor elevator as Vandenburg and Banks took the victim to the second floor. The surveillance video also showed the Appellant after the crimes eating food, using the elevator, walking to the bathroom to take a shower, walking back to his room after the shower, and accompanying Enoch to his room. The Appellant walked unassisted throughout the video and never stumbled, fell, or leaned against the wall for balance.

The surveillance video also showed the defendants carrying the victim into Gillette Hall, and the victim did not appear to be conscious. Likewise, the victim did not appear to be conscious in any of the videos recorded in room 213. Prioleau, who was in the room with the defendants and the victim, testified that he never heard her make a sound and that she seemed to be unconscious when he left. The first indication that the victim was aware of her surroundings occurred when surveillance video recorded her walking from the area of room 213 and entering the bathroom about 5:00 a.m. From all of this evidence, a reasonable jury could have rejected the Appellant's claim that he was unaware of his actions and unaware of the victim's mental incapacitation or physical helplessness. Accordingly, the evidence is sufficient to support the convictions.

### E. Letters at Sentencing

The State asserts that the trial court erred by relying on ex parte letters and emails from the community in determining the Appellant's fifteen-year sentence for aggravated rape. The Appellant does not address the State's claim. We conclude that the trial court erred but that the error was harmless.

At the Appellant's July 15, 2016 sentencing hearing, the victim read an extensive impact statement to the trial court and requested that the Appellant receive the maximum punishment of twenty-five years for aggravated rape. The State introduced the Appellant's presentence report into evidence, argued that numerous enhancement factors applied to his convictions, and also requested that he receive a twenty-five-year sentence

for aggravated rape. Three witnesses testified on the Appellant's behalf: two pastors and his mother. In pronouncing the Appellant's sentences, the trial court stated as follows:

> The Court has weighed all of the factors, the enhancement factors, mitigating factors. The Court has read the letters in support of Mr. Batey. The Court has listened to the witnesses today, the victim today; and so the Court is keenly aware of how people feel with regard to this case.

According to the State's brief, "[t]his was the first time the State learned that any letters had been submitted on behalf of Defendant."

The trial court sentenced the Appellant to fifteen years for aggravated rape. On August 15, 2016, the State filed a motion for a new sentencing hearing, arguing that the State learned after sentencing that eleven letters and emails in support of the Appellant had been submitted directly to the trial court through the criminal court clerk between July 7 and July 14, 2016. The State argued that because the letters and emails were not submitted as part of the presentence report or introduced into evidence as exhibits by defense counsel at the sentencing hearing, "the State was deprived of the opportunity to contest the content of the letters, to question the veracity of the information contained in the letters, or to rebut the information by presenting testimony or submitting letters in response." The Appellant responded to the motion, claiming that the only way to appeal the sentence was through this court pursuant to Tennessee Code Annotated section 40-35-402. The Appellant also claimed that, regardless, the mitigating factors presented at sentencing, including the Appellant's good character and potential for rehabilitation, and the witnesses who testified on his behalf supported the trial court's imposition of the fifteen-year sentence for aggravated rape.

The trial court held a brief hearing on the motion and stated that it was "customary" on the day of sentencing for the court to read the defendant's presentence report, sentencing memorandums, and character letters received by the court. The trial court stated that it would take the matter under advisement and issue a ruling.

In a written order, the trial court denied the State's request for a new sentencing hearing, explaining as follows:

> The defendant put the State on notice of [his] intent to argue mitigating factors when [he] submitted witnesses and the mitigating factors to the State. It is common for community members to send letters in support of a defendant or a victim, especially in high profile cases. Beginning July 7, 2016, when the clerk received the letters via mail or email, these letters were put in the defendant's case file. As stated by the Court, the character letters were not read until the morning of the

sentencing hearing as is its custom to do so. The file, including the character letters, was available for review at any time by the parties.

Applying the standard for recusal set forth in <u>Alley v. State</u>, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994), the Court believes it can be fair and impartial and that a reasonable person of ordinary prudence in the judge's position knowing all the facts known would find no partiality. The Court harbors no bias for or against the parties in this case. The Court weighed the enhancing and mitigating factors, witness testimony, and the presentence report, and reached an appropriate sentence within the applicable sentencing guidelines.

The Tennessee Rules of Evidence apply at a sentencing hearing "except that reliable hearsay . . . may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted." Tenn. Code Ann. § 40-35-209(b). "Ordinarily, character letters written on behalf of the defendant should be given due consideration similar to that of other hearsay information submitted through a presentence report." <u>State v. Bud Cash, Jr.</u>, No. 286, 1992 WL 13905, at *12 (Tenn. Crim. App. at Knoxville, Jan. 30, 1992). "[A] letter which is original in content and identifies the author by address, position and relationship to the parties carries indicia of reliability not present in a form letter which identifies the sender only by name." <u>Id.</u> at *12.

That said,

[i]t is highly improper for a citizen to write or otherwise communicate with a judge regarding the disposition of a pending case. However, most judges, knowing that such letters are improper, either don't read the letters or don't consider the letters in reaching their [sentencing] decision. Nevertheless, all of the letters received by a trial judge, whether received in chambers or in open court, should be filed in the cause and made a public record. Such a format permits counsel for the respective parties to read the letters. In addition, the letters may be considered by this Court when a party presents an issue predicated upon the letters. Moreover, this format will result in the avoidance of any potential impropriety or appearance of impropriety, namely, being influenced by the letters received in chambers. [Tenn. Sup. Ct. R. 10, Cannon 2].

<u>State v. Birge</u>, 792 S.W.2d 723, 726 (Tenn. Crim. App. 1990).

The State asserts that "it is not clear precisely" how the letters and emails got to the trial court but that "[i]t is clear . . . the letters were not made an exhibit to any filing by Defendant, were not made an exhibit at the sentencing hearing, and were not even

mentioned by the Defendant in his argument at the sentencing hearing." We have reviewed the letters and emails, which are in the appellate record. In one of the emails, the writer stated, "I was asked by Cory Batey's attorneys if I would be willing to send a character letter on Mr. Batey's behalf for his sentencing hearing on July 15, 2016." Thus, it appears that defense counsel was responsible for the letters having been sent to the criminal court clerk, who then forwarded them to the trial court. The communications identify the writers by their street or email addresses and describe their positions and relationships to the Appellant. Accordingly, they were reliable hearsay, and defense counsel could have and should have introduced them into evidence as an exhibit at the sentencing hearing. Because defense counsel failed to do so, the trial court should not have read the letters or considered them in determining the Appellant's sentences.

Nevertheless, the trial court stated in its order denying the State's motion that it "weighed the enhancement and mitigating factors, witness testimony, and the presentence report, and reached an appropriate sentence." Furthermore, although the State claims on appeal that it was denied an opportunity to rebut the letters and emails with evidence showing that the Appellant did not have good character, the State has not suggested what evidence it would have presented to rebut the letters and emails. We note that three witnesses testified on the Appellant's behalf at sentencing. All of them testified as to the Appellant's good character, and the State cross-examined the witnesses. However, the State did not present any evidence to rebut their testimony. Therefore, we conclude that the trial court's error was harmless. See Tenn. R. App. P. 36(b).

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE